**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 23, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

J.R. SIMPLOT; SIMPLOT PHOSPHATES
LLC, formerly known as SF Phosphates
Limited Company; SF PIPELINE
LIMITED COMPANY,

      Plaintiffs-Counter-Defendants-
      Appellees,

v.

CHEVRON PIPELINE COMPANY;
CHEVRON CHEMICAL COMPANY;
CHEVRON U.S.A., INC.,

      Defendants-Counter-Claimants-
      Appellants,

No. 07-4074

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:04-CV-624-DAK)**

Peder K. Batalden of Horvitz & Levy LLP, Encino, California (David M. Axelrad
of Horvitz & Levy LLP, Encino, California; and E. Scott Savage and Stephen R.
Waldron of Berman & Savage, P.C., Salt Lake City, Utah, with him on the
briefs), for Defendants-Counter-Claimants-Appellants.

Peter W. Billings (Douglas B. Cannon, William H. Adams, and Timothy K. Clark,
with him on the brief) of Fabian & Clendenin, Salt Lake City, Utah, for Plaintiffs-
Counter-Defendants-Appellees.

Before **BRISCOE**, **SEYMOUR** and **LUCERO**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

J.R. Simplot Company, Simplot Phosphates, LLC, and Simplot Pipeline, LLC (collectively "Simplot") sued Chevron Pipeline Company, Chevron Chemical Company, and Chevron U.S.A., Inc., (collectively "Chevron") for failure to defend and indemnify Simplot pursuant to two sales agreements. Chevron denied its liability and asserted counterclaims. The district court granted summary judgment in favor of Simplot, determining Chevron breached its duty to defend. As damages, the court awarded Simplot the attorneys' fees and costs it had incurred in defending the underlying litigation. Chevron appeals from the district court's judgment. We affirm in part and reverse in part.

**I.**

The relevant background begins over twenty years ago in the western United States. Chevron owned and operated a phosphate mine in Utah. It also owned a phosphate fertilizer processing plant in Wyoming. To transport the phosphate ore from Utah to Wyoming, Chevron constructed a ninety-seven mile pipeline between the two locations. Ashley Creek Phosphate Company owned undeveloped phosphate leases adjacent to Chevron's Utah mine. Ashley Creek sought access to Chevron's pipeline, claiming Chevron was a common carrier and its pipeline was an essential facility for developing a phosphate mining operation.

### The Initiation of the Ashley Creek Litigation

In May 1989, Chevron published a tariff for its pipeline. Ashley Creek sued Chevron, alleging the pipeline tariff was so high that it violated antitrust laws by excluding Ashley Creek from the market. The district court referred the question of the tariff's reasonableness to the Surface Transportation Board ("STB") and stayed the remainder of the case.[1] While the action was pending before the STB, Chevron began negotiations to sell its entire phosphate operation, including the pipeline, to Simplot.

### Negotiations and the Sale

Simplot knew it might be subject to suit by Ashley Creek if it purchased Chevron's pipeline, and it entered negotiations with Chevron over who would be responsible for the defense of the pending Ashley Creek litigation. Chevron informed Simplot, "[i]t is our preference to sell the business as is and reflect the risk of possible pre-closing liabilities in the closing price. If this should be unacceptable, Chevron might be willing to accept pre-closing liabilities on a cost sharing basis for a limited time." 8 Aplt. App. at 2105. Simplot counter-offered that it would take control of the Ashley Creek litigation at Chevron's expense.

---

[1] The district court actually referred the question to the Interstate Commerce Commission ("ICC"), which had jurisdiction over the matter until 1995. In 1995, Congress abolished the ICC and transferred Ashley Creek's proceeding to the STB. For ease of understanding, we refer to the ICC as the STB throughout this opinion.

The parties met and tentatively agreed that "Chevron w[ould] retain responsibility [over the litigation] but w[ould] consult with [Simplot] regarding any settlement." *Id.* at 2112 (capitalization omitted).

Simplot circulated a draft sale agreement following the face-to-face negotiations. The draft provided that Simplot would assume control over the defense of the Ashley Creek litigation, but that Chevron would be responsible for attorneys' fees, costs, and damages resulting from the litigation. Chevron did not accept Simplot's draft, stating that the "principal issue continues to be the liability provisions." *Id.* at 2140.

Simplot circulated revised drafts. The drafts stated that Chevron would retain control over the defense of the Ashley Creek litigation, advise Simplot of the status of the proceedings, consult with Simplot concerning defense strategy, settle the litigation only with Simplot's permission, and pay "all [resulting] penalties, damages, and costs." *Id.* at 2149, 2163. Simplot would assume only "the responsibility and cost of prospective compliance with the tariff when set in the [STB] Case." *Id.* at 2163. Simplot circulated three additional drafts. None of the drafts materially altered these revised terms. Simplot and Chevron closed the sale in 1992.

Two final agreements were central to this sale: the Phosphate Slurry Pipeline Asset Sale Agreement ("Pipeline Agreement") and the Phosphate Fertilizer Business Asset Sale Agreement ("Plant Agreement"). The Agreements

-4-

contain virtually identical pertinent terms, discussed more fully *infra*, which include indemnification provisions and an integration clause. The Agreements provide, as of the closing date, that Simplot would assume (i) liabilities relating to its purchase that arose after the closing date and (ii) liabilities specifically set forth in particular provisions. Chevron retained responsibility for its defense in the pending Ashley Creek litigation and any concomitant damages and costs. The Agreements also provide that Chevron would, *inter alia*, indemnify and defend Simplot for liabilities (i) arising from the operation of the pipeline *before* the closing date or (ii) arising from a breach of any representation, warranty, or covenant. In exchange, Simplot agreed to indemnify and to defend Chevron for liabilities (i) arising from the operation of the pipeline *after* the closing date or (ii) arising from a breach of any representation, warranty, or covenant.

### *The Ashley Creek Litigation Post Closing*

Upon acquiring the pipeline, Simplot adopted the same tariff previously published by Chevron. In response, Ashley Creek filed an STB complaint against Simplot alleging various antitrust claims. Simplot retained Chevron's STB lawyer for representation before the STB, and it paid for this initial defense.

The STB eventually consolidated Ashley Creek's cases against Simplot and Chevron. Simplot notified Chevron of its contractual duty to pay the expenses of the Ashley Creek litigation, proposing that "Chevron reimburse [it] for all costs incurred to date in the [STB] proceedings and agree to assume all costs incurred

-5-

in the future." 9 Aplt. App. at 2396. Simplot reasoned that this proposal conformed with the Pipeline Agreement "[b]ecause all of the Ashley Creek proceedings revolve around the question of Chevron's compliance or non-compliance with [] [federal law]." *Id.* Chevron rejected Simplot's proposal, claiming it "should not pay for additional costs, if any, related solely to [Simplot] obtaining [STB] approval for its tariff or allegations by Ashley Creek directed at [Simplot]." *Id.* at 2399.

Ashley Creek also sued Simplot in district court. The court consolidated Ashley Creek's cases against Simplot and Chevron. Simplot asked Chevron to pay for its attorneys' fees, costs, losses, and liabilities incurred in connection with the district court case. As in the STB case, Chevron refused. Simplot and Chevron agreed to toll any claims against each other until the completion of the Ashley Creek litigation. Simplot and Chevron ultimately prevailed against Ashley Creek.

The road to Ashley Creek's defeat began in 1996 when the STB issued its decision outlining the framework and methodology for calculating a reasonable tariff. Although the STB did not determine reasonableness, it did suggest the aggregate tariffs charged were likely unreasonable. The STB's implied solution was adoption of a tariff well below Simplot's operating costs to offset the higher tariffs charged during Chevron's period of ownership. Simplot did not publish a new, significantly reduced tariff until 1999. When it did so, its goal was to defeat

-6-

Ashley Creek's claims by "lowering the tariff to remove any argument that the tariff [wa]s preventing Ashley Creek from mining phosphate rock." 1 Aplt. App. at 264.

Thereafter, the district court granted summary judgment in favor of Simplot and Chevron in the Ashley Creek litigation. The court held that Simplot's current and prior tariffs were not unreasonable or exclusionary.[2] Even if Chevron's higher tariffs were included in the analysis, the total tariff collections over the relevant time frame were not unreasonable because of Simplot's new, below market rates. Ashley Creek appealed, and we affirmed based on a lack of antitrust standing. *See Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1261 (10th Cir. 2003).

### *The Current Action*

In July 2004, Simplot sued Chevron for the attorneys' fees and costs it incurred in the Ashley Creek litigation, as well as prejudgment interest. Simplot claimed Chevron had a duty to defend and to indemnify it under the Agreements and demanded a jury trial. Chevron filed counterclaims, asserting Simplot had a contractual obligation to pay part of Chevron's attorneys' fees and costs.

The district court granted partial summary judgment in favor of Simplot with respect to its claims against Chevron. After reviewing Chevron's proffered

---

[2] The court did not expressly rule on the reasonableness of Chevron's tariffs.

extrinsic evidence, the court determined the relevant contractual language was unambiguous. It analogized the Agreements to third-party insurance contracts and held Chevron had breached its contractual duty to defend Simplot in the Ashley Creek litigation. It reasoned Chevron had a duty to defend Simplot because Ashley Creek's allegations (i) related to or arose out of acts occurring before the 1992 closing and (ii) raised the question of whether Chevron's pre-closing tariffs constituted a breach of warranty. The court held, however, that Chevron had no indemnification duty because Ashley Creek did not obtain a judgment against Simplot.

The district court applied the same rationale in granting partial summary judgment in favor of Simplot on Chevron's counterclaims. Just as Chevron had no duty to indemnify Simplot, Simplot had no duty to indemnify Chevron in the absence of an adverse judgment. The court also concluded Simplot had no contractual duty to ensure the reasonableness of its tariff, and Chevron could not use the covenant of good faith and fair dealing to create such an obligation to which Simplot did not agree.

Regarding the remaining issue of damages, the district court denied Chevron's request for a jury trial on the amount of attorneys' fees and costs to be awarded Simplot for its defense of the Ashley Creek litigation. The court held that Simplot was entitled to the benefit of its contractual bargain, and that its

$2,913,546 in requested fees and costs was not "inequitable or unreasonable."[3] The court concluded that Simplot was justified in hiring different counsel for each of the separate corporate entities affiliated with Simplot. It awarded Simplot its requested fees and costs, plus prejudgment interest, and entered a judgment of $5,108,453.15 against Chevron. This appeal followed.

Chevron asks us to revisit three specific issues central to the district court's decision. First, Chevron argues that Simplot must bear its own litigation expenses under the plain language of the Agreements. In the alternative, Chevron claims that the Agreements are ambiguous and that their interpretation raises a question of fact for a jury. Second, Chevron contends it can recoup some of its litigation expenses from Simplot pursuant to an implied covenant of good faith and fair dealing. Third, Chevron asserts it has a Seventh Amendment right to a jury trial to ascertain the amount of Simplot's damages from any breach of the duty to defend. We address each issue in turn.

**II.**

We review a district court's summary judgment decision *de novo*, viewing the evidence in the light most favorable to the party opposing summary judgment. *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1231 (10th Cir. 2008).

---

[3] Simplot paid three law firms a total of $2,913,546 in fees and costs for 15,142 hours of service for representing the several related entities sued by Ashley Creek.

"Summary judgment is appropriate if there is no genuine issue as to any material fact and . . . the [movant] is entitled to a judgment as a matter of law." *Kelley v. City of Albuquerque*, 542 F.3d 802, 820 (10th Cir. 2008) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c). While the movant has the burden of showing no genuine issue of material fact exists, the party opposing summary judgment must "present evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## A.

The first issue before us is whether Chevron has a duty under the Agreements to pay Simplot the attorneys' fees and costs it incurred in defending against the Ashley Creek litigation. We must determine whether the Agreements are ambiguous, and, if not, whether Chevron is liable to Simplot under the unambiguous terms. In this diversity case, we turn to Utah law to interpret the Agreements.[4] For the sake of brevity, we recite only the Pipeline Agreement's terms.

### *Integration*

Before delving into the ambiguity inquiry, Utah law requires us to decide whether the Agreements are integrated. *Daines v. Vincent*, 190 P.3d 1269, 1275

---

[4] The district court held Utah law governs the Agreements, a determination the parties do not dispute on appeal. Accordingly, we apply Utah law as provided in the Agreements.

(Utah 2008). The parol evidence rule generally precludes the admission of "evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an *integrated* contract." *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1026 (Utah 1995), overruled on other grounds by *Tangren Family Trust v. Tangren*, 182 P.3d 326 (Utah 2008). The rule does not apply, however, in the case of contractual ambiguity. *See id.*

Here, the Agreements' integration clauses states:

> 12.9 <u>Entire Agreement</u>. This Agreement, including the Schedules and other writings referred to herein or delivered pursuant hereto, constitutes the entire agreement between [Chevron] and [Simplot] with respect to the subject matter hereof, and supersedes all prior oral or written agreements, commitments or understandings with respect thereto . . . . No amendment or waiver of the terms of this Agreement shall be binding on the parties unless in writing and signed by authorized representatives of both parties hereto. . . . The headings used in this Agreement are for convenience of reference only and shall not be used to define the meaning of any provision.

5 Aplt. App. at 1333; *accord* 6 Aplt. App. at 1503-04. The integration clause is clear that the Agreements constitute the "*final and complete*" expression of the parties' bargain.[5] *Tangren*, 182 P.3d at 330 (emphasis in original).

### *Ambiguity*

A contract qualifies as ambiguous if it lends itself to "more than one

---

[5] This conclusion does not ultimately affect our analysis, however. As explained *infra*, we must at least *consider* – although not necessarily admit – parol evidence regardless of our integration determination.

reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002) (internal quotation marks omitted). A court first must decide whether a contract contains a facial ambiguity arising from the contractual language. *Daines*, 190 P.3d at 1276. The court may consider any "relevant and credible evidence of contrary interpretations" in making this legal determination. *Id.* If the court concludes that "the interpretations contended for are reasonably supported by the language of the contract," *id.* (internal quotation marks omitted), the contract is ambiguous on its face, *see id.* Only then does the question of ambiguity become factual, requiring the court to admit parol evidence of the parties' intentions in order to clarify the ambiguity. *See id.*

Here, four sections of the Agreements are relevant. Sections 2.5 through 2.6 of each Agreement deal with the parties' assumption of specific obligations:

> 2.5 <u>Assumption of Liabilities</u>. Effective as of the Closing Date, [Simplot] shall assume only those liabilities and obligations relating and attributable to the ownership or operation of the Assets or the Pipeline System which arise out of events or acts occurring after the Closing Date, and the Assumed Obligations specifically assumed by [Simplot] pursuant to Section 2.6 below . . . .

> 2.6 <u>Assumed Obligations</u>. Subject to the provisions of this Section 2.6, [Simplot] shall assume the following obligations as of the Closing Date (the "Assumed Obligations"):

> 2.6.1 <u>Litigation</u>. [Chevron] . . . will retain responsibility for and control over the defense of [its] . . . involvement in the litigation, <u>Ashley Creek Phosphate Co. v. Chevron Pipe Line Co., et. al.</u>, [STB] Docket No. 40131 (Sub.-No.1) ("[STB] Case") and <u>Ashley Creek</u>

Phosphate Co. v. Chevron U.S.A., Inc., 89-C-554-S (D. Utah, filed June, 1989), and [Chevron] shall be responsible and liable for all penalties, damages, and costs granted in such litigation or resulting from settling such cases. [Simplot] shall assume the responsibility and cost of prospective compliance with the tariff when set in the [STB] Case and any mandatory prospective compliance orders granted in either case. [Chevron] shall, in handling such litigation, keep [Simplot] fully informed on the status of the cases and, [sic] consult with [Simplot] concerning defense strategy, and allow [Simplot] to make recommendations. [Chevron] shall make decisions concerning the litigation and pursue the litigation vigorously and in due consideration of the economic viability of the mine and the fertilizer plant as if [Chevron] was still the owner of the Pipeline System, and its Affiliates were still owners of the mine and fertilizer plant. [Chevron] . . . will not settle either case without the written permission of [Simplot], which shall not unreasonably be withheld . . . .

5 Aplt. App. at 1276-77; *accord* 6 Aplt. App. at 1428-30. Section 11.2.1 concerns

Chevron's general indemnification obligations:

11.2.1 Indemnification by [Chevron]. [Chevron] shall indemnify, defend and hold [Simplot] . . . harmless from and against all claims, suits, damages, losses, expenses, costs, obligations, liabilities, recoveries and deficiencies, including interest, penalties and attorneys' fees, that [it] shall incur or suffer, which arise or result from (a) any and all liabilities and obligations attributed to the operation or ownership of the Assets or the Pipeline System prior to the Closing Date, which liabilities or obligations are not assumed by [Simplot] under the terms of this Agreement; (b) the breach of, or failure of [Chevron] to perform any representation, warranty, covenant or agreement given or made by [Chevron] herein, or in any writing furnished or to be furnished by [Chevron] under this Agreement; (c) any suit, action, arbitration, or legal, administrative, governmental or other proceeding that relates to the ownership or use of the Assets or the Pipeline System prior to the Closing . . . .

5 Aplt. App. at 1321-22; *accord* 6 Aplt. App. at 1492.

Chevron argues that the Agreements may be interpreted in more than one

reasonable way and are therefore ambiguous. One reasonable interpretation, Chevron contends, is that section 2.6 exclusively covers all potential claims by Ashley Creek, and under that section Simplot assumed responsibility for such claims subject only to the exceptions listed in section 2.6.1. Thus, section 2.6 states that Simplot assumed "the following obligations as of" closing "subject to," *inter alia*, section 2.6.1. Chevron points out that section 2.6.1 speaks only to *Chevron's* – not Simplot's – obligations. Because section 2.6.1 is silent about Simplot's duties, Chevron asserts, Simplot must have assumed all responsibility for the Ashley Creek litigation under section 2.6. In sum, Chevron argues that the structure of section 2.6.1 shows Simplot assumed total responsibility for any Ashley Creek claims left unmentioned by section 2.6.1.

Chevron further contends that the general indemnification provision in section 11.2.1 does not limit Simplot's assumption of responsibility. It argues that, to the extent section 11.2.1 can be read broadly to apply to the Ashley Creek litigation, it cannot be reconciled with Simplot's specific assumption of responsibility in section 2.6.1. According to Chevron, "[w]hen general and specific provisions of a contract cannot be reconciled, the specific provisions prevail." Aplt. Br. at 40. Chevron claims the extrinsic evidence – including the prior drafts of the Agreements, the parties' negotiations, Chevron's understanding of the Agreements, and Simplot's post-closing behavior – supports its reading of the Agreements.

We have reviewed all of the relevant, extrinsic evidence, but it is "the language of the contract[s] alone" that ultimately controls our decision. *Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 178 P.3d 886, 889 (Utah 2008). Notwithstanding extrinsic evidence, we cannot read an ambiguity into the Agreements where none exists. *See Daines*, 190 P.3d at 1277 ("[T]here can be no ambiguity where evidence is offered in an attempt to obscure otherwise plain contractual terms."). For the reasons set forth below, we agree with the district court that the Agreements are unambiguous and cannot be reasonably "understood in more than one way." *Deep Creek Ranch*, 178 P.3d at 889. We therefore interpret them as a matter of law. *See Cent. Fla. Invests. Inc. v. Parkwest Assocs.*, 40 P.3d 599, 605 (Utah 2002) ("If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.")

Chevron's structural argument twists the plain language of the Agreements.[6] Under section 2.5, Simplot assumed "only those liabilities and

_____

[6] Chevron contends it does not have to point to individual words that are ambiguous; it may rely on the nature and character of the transaction as a whole, claiming that *WebBank* supports its argument. We disagree. While *WebBank* did indeed hold that a contract may be ambiguous as a whole, despite the absence of an ambiguity in the "terms and provisions of the contract themselves," 54 P.3d at 1145, the context of *WebBank's* holding was narrow. *WebBank* limited its holding to the specific "context of whether a particular agreement should be
(continued...)

-15-

obligations relating . . . to the ownership or operation of the . . . Pipeline System

which ar[o]se out of events . . . occurring after the Closing Date, *and* the

Assumed Obligations specifically assumed by [Simplot] pursuant to Section 2.6

. . . ." 5 Aplt. App. at 1276-77 (emphasis added); *accord* 6 Aplt. App. at

1428-30. Section 2.5's distinction between post-closing liabilities and Assumed

Obligations indicates Simplot assumed some obligations in section 2.6 that did

not arise after closing. Section 2.6.1 then outlines the parties' responsibilities.

Chevron agreed: (1) to retain responsibility for and control over the defense of its

involvement in the Ashley Creek litigation, (2) to be liable for all penalties,

damages, and costs granted in or resulting from such litigation, (3) to fully inform

Simplot about the status of the Ashley Creek cases, (4) to consult with Simplot

concerning defense strategy, (5) to pursue the Ashley Creek litigation vigorously

as if Chevron were still the owner, and (6) to settle the litigation only with

Simplot's permission. Simplot, by contrast, assumed only "the responsibility and

cost of prospective compliance with the tariff when set in the [STB] Case and any

mandatory prospective compliance orders granted in either case." 5 Aplt. App. at

1277; *accord* 6 Aplt. App. at 1429. Section 2.6.1 does not even *mention* potential

[6](...continued)
considered a secured transaction for purposes of Article 9 of the UCC." *Id.*
Moreover, it found ambiguity when it considered together the several contracts
the parties executed as part of the transaction, 54 P.3d at 1146-47. We do not
have a similar ambiguity here.

-16-

claims that Ashley Creek might bring against Simplot. Moreover, if Simplot assumed total responsibility for the Ashley Creek litigation under section 2.6, there would have been no need to specify Simplot's duty to set a conforming tariff under section 2.6.1. That duty would have been automatically assumed under section 2.6's umbrella. In sum, nothing in the body of section 2.6 supports Chevron's structural argument; it is "the result of a forced or strained construction" and fails to show ambiguity. *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 433 (Utah 2006).

Thus, we are left with section 11.2.1, in which Chevron assumed a duty to defend Simplot against "*any* and *all* [unassumed] liabilities . . . attributed to" the pre-closing pipeline operations or "*any* suit . . . that relates to" ownership or use prior to closing. 5 Aplt. App. at 1321-22 (emphasis added); *accord* 6 Aplt. App. at 1492. This language does not exclude potential claims by Ashley Creek and is not inconsistent with section 2.6.1 when read in a straightforward fashion. Section 2.6.1 charges Simplot with a duty to set its tariff in compliance with mandatory orders in Ashley Creek's suit against Chevron, and section 11.2.1 charges Chevron with a duty to defend Simplot against *any* litigation arising from pre-closing pipeline operations. The Agreements contain no ambiguity; they simply fail to address explicitly Simplot's potential involvement in the Ashley Creek litigation.

The only remaining question is whether Ashley Creek sued Simplot because

-17-

of or in relation to Chevron's pre-closing pipeline operations. We hold that it did.

While Simplot's initial post-closing tariff may have at least partially triggered

Ashley Creek's antitrust claims, Simplot could not have avoided being joined in

the Ashley Creek litigation no matter what tariff it adopted. Ashley Creek

claimed from the beginning that the owner of the pipeline had monopoly power,

and that antitrust law required the owner to sell access at competitive rates. Once

Simplot joined the litigation, Ashley Creek sought an order "requiring [Simplot]

to sell to [] Ashley Creek the permanent excess capacity of the . . . pipeline . . . .

on the same terms and conditions under which [Simplot] acquired the facility . . .

." 9 Aplt. App. at 2467-68. Because access to this so-called "essential facility"

was at the heart of Ashley Creek's suit against Chevron, and Chevron's ostensibly

unreasonable tariffs triggered this suit, Ashley Creek's claims against Simplot

necessarily "ar[o]se . . . from" and were "related to" Ashley Creek's claims

against Chevron. Whoever owned the pipeline would be a target for Ashley

Creek's claims. We therefore conclude that Chevron had a duty to defend

Simplot under the plain language of section 11.2.1.[7] The district court did not err

---

[7] Chevron warranted in the Pipeline Agreement that its operation of the pipeline system complied with all applicable laws and regulations. Simplot pointed out that Chevron did not challenge in its opening brief the district court's alternative ruling that Chevron breached its warranty and thus had a duty to defend Simplot under section 11.2.1. Aple. Br. at 29-30. Chevron replied that its "specific-trumps-general argument" applies as much to the warranty issue as it does to the section 2.6 indemnification issue. Reply Br. at 14. Therefore,

(continued...)

-18-

in granting summary judgment in favor of Simplot on this breach of contract claim.

**B.**

The second issue before us is whether Simplot breached any implied duty of good faith and fair dealing owed to Chevron under the Agreements. "An implied covenant of good faith and fair dealing inheres in every contract. . . . [B]oth parties . . . impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004) (citations omitted). A violation of the implied covenant gives rise to a claim for breach of contract. *Id.* Whether a violation has occurred is generally a factual issue, but should be decided as a matter of law "when reasonable minds could not differ in concluding that the [alleged breaching] party . . . did not wrongfully exercise its discretionary power or contractual authority for a reason beyond the risks that the other party assumed or for a reason inconsistent with the other party's justified expectations." *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 968-69 (Utah 2008). "To determine the legal duty a contractual party has under this covenant, a court will assess whether a party's actions [are] consistent with the agreed common purpose and the justified

---

[7](...continued)
Chevron claims, it implicitly raised the challenge in its opening brief. Because we decide in Simplot's favor on the duty-to-defend issue, we need not address this matter.

-19-

expectations of the other party" as manifested in the course of dealings, contractual language, and conduct of the parties. *Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1239-40 (Utah 2004) (alteration in original) (internal quotation marks omitted).

The scope of the implied covenant of good faith and fair dealing "turns on the extent to which the contracting parties have defined their expectations and imposed limitations on contract terms." *Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1159 (Utah 2003). Four general principles limit the scope of the covenant. *Oakwood Vill.*, 104 P.3d at 1240. First, the covenant cannot be understood "to establish new, independent rights or duties to which the parties did not agree ex ante." *Id.* Second, the covenant cannot result in "rights and duties inconsistent with express contractual terms." *Id.* Third, the covenant cannot force "a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party to the contract." *Id.* (internal quotation marks omitted). Finally, the covenant cannot be used to achieve an outcome inconsistent with the written terms of the contract. *Id.*

Chevron argues Simplot breached the implied covenant of good faith and fair dealing when it failed to lower its tariff immediately after the STB issued its decision. Section 2.6.1 of the Agreement provides that Simplot "shall assume the responsibility and cost of prospective compliance with the tariff when set in the [STB] Case and *any mandatory* prospective compliance orders granted in either

[the STB or district court] case." 5 Aplt. App. at 1277 (emphasis added); *accord* 6 Aplt. App. at 1428-30. Chevron contends the STB's decision qualifies as a "mandatory prospective compliance order," giving Simplot discretion to lower its tariff within a certain time frame. Chevron asserts that because Simplot's discretion "was cabined by the covenant of good faith and fair dealing," Simplot had to "move quickly" to lower its tariff to avoid harming Chevron. Aplt. Br. at 53. According to Chevron, Simplot's delay in publishing a new tariff harmed Chevron because Chevron could not obtain summary judgment against Ashley Creek until Simplot set a new, significantly reduced tariff. Chevron contends Simplot must indemnify it for its attorneys' fees and costs incurred in the Ashley Creek litigation from the time Chevron should have been able to move for summary judgment until Simplot lowered its tariff in compliance with the STB decision.

Our review of the agreements and the record persuades us the district court did not err in granting summary judgment against Chevron on its counterclaim for breach of the implied covenant of good faith and fair dealing. Reasonable minds would agree that Simplot did not "wrongfully exercise its discretionary power or contractual authority." *Oman*, 194 P.3d at 968-69. The STB's decision did not trigger Simplot's compliance duty because the STB decision was not

-21-

"mandatory."[8] The STB did not order Simplot to do anything. It did not even determine the reasonableness of the tariffs.[9] It simply outlined the framework and methodology for calculating a reasonable tariff, which the district court later applied. Therefore, the propriety of Simplot's exercise of discretion in adopting a new tariff is irrelevant. If Simplot had no contractual duty to fulfill, Chevron cannot claim breach of a covenant inherent in that duty. *Cf. Oakwood Vill.*, 104 P.3d at 1240 (noting the "established principle" that a tenant's "cessation of operation" cannot be in bad faith if there is no express or implied covenant providing for continued operation).

Moreover, even if the STB decision had triggered Simplot's contractual duty to comply with "any mandatory prospective compliance orders," the implied covenant of good faith and fair dealing still would not have required Simplot to pursue every benefit imaginable to Chevron. The covenant required Simplot only "to refrain from actions that w[ould] intentionally destroy or injure the other party's right to receive the fruits of the contract." *Id.* at 1239 (internal quotation

[8] "Mandatory" is defined as "[o]f, relating to, or constituting a command; required; preemptory." BLACK'S LAW DICTIONARY (8th ed. 2004). While Chevron may be correct that "Simplot did not have the option to disregard [the STB decision,]" Aplt. Br. at 16, particularly because it became the law of the case [10 Aplt. App. at 2639], the STB decision did not command or require Simplot to take any responsive action.

[9] In fact, Chevron *agreed* with the district court that "the STB did not find any of the Tariff rates to be unreasonable." 5 Aplt. App. at 1143; *see also id.* at 1110-11 (arguing that "[t]he STB did not 'conclude' that any of the Tariff rates were unreasonable").

marks omitted). Chevron has offered absolutely no evidence that Simplot intentionally delayed publishing a new tariff for the purpose of destroying or injuring Chevron. Chevron's bad faith claim simply lacks common sense. Chevron and Simplot shared the same interest regarding summary judgment against Ashley Creek. If Simplot had intentionally and needlessly delayed publishing a new tariff, such a maneuver would have precluded Simplot – as well as Chevron – from obtaining judgment.

In addition, we are not persuaded the Agreements gave Chevron a justified expectation that Simplot would immediately reduce its tariff in response to a non-mandatory agency decision. In fact, Chevron's own actions illustrate "justified expectations" contrary to those it now claims. Chevron never notified Simplot of a duty to immediately lower its tariff. Even when Simplot, on its own accord, reduced its tariff well-below market, Chevron did not immediately move for summary judgment. Chevron continued discovery and did not file its motion until after Simplot had fully briefed and argued the summary judgment issues.

We see no need to address the parties' remaining arguments. The district court properly granted summary judgment in favor of Simplot on Chevron's counterclaim.

## III.

The third issue before us, one of first impression in this circuit, is whether Chevron has a Seventh Amendment right to a jury trial to determine the amount of costs and attorneys' fees Simplot incurred in defending itself in the Ashley Creek litigation, as damages for Chevron's breach of contract. The district court held that the amount of attorneys' fee is an issue for the court rather than for a jury. This is a question of law we review *de novo*. *Mile High Indus. v. Cohen*, 222 F.3d 845, 855 (10th Cir. 2000). Federal law determines the right to a jury trial in federal court, even in cases in which jurisdiction rests upon diversity of citizenship. *Simler v. Conner*, 372 U.S. 221, 222 (1963) (per curiam).

The right to a jury trial as declared by the Seventh Amendment is preserved inviolate. *See* Fed. R. Civ. P. 38(a). The Seventh Amendment protects this right "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. CONST. amend. XII. The Supreme Court has held that "the phrase 'Suits at common law' refers to 'suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered.'" *Teamsters, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990) (emphasis and alterations in original). The nature of the issues presented and the remedies sought determines whether an action qualifies as "legal." *Id.* at 565. The general rule is that monetary relief is legal. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710

-24-

(1999). An ordinary breach of contract claim is no different. *See Terry*, 494 U.S. at 569-70 (Marshall, J., concurring) (noting that a breach of contract claim is a legal issue); *Ross v. Bernhard*, 396 U.S. 531, 542 (1970) (concluding stockholders in derivative action were entitled to a jury trial where the complaint included allegations of ordinary breach of contract and gross negligence and sought damages); *Simler*, 372 U.S. at 223 (holding declaratory judgment action by client wherein client challenged the enforceability of a contingent fee retainer agreement "was in its basic character a suit to determine and adjudicate the amount of fees owing to a lawyer by a client under a contingent fee retainer contract, a traditionally 'legal' action");[10] *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) ("As an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character.").

The Supreme Court has not specifically addressed a case where previously incurred attorneys' fees are sought as the measure of compensatory damages in a breach of contract suit. Unlike cases in which attorneys' fees are allowable to the prevailing party, here Simplot's attorneys' fees and costs are *themselves* part of

_____

[10] As later intimated by the Court, *Simler* stands for the principle that "[t]he Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." *Ross*, 396 U.S. at 538 (citing *Simler*). The actual language in *Simler* supports this interpretation. *Simler* concluded, "The fact that the action is in form a declaratory judgment case should not obscure the essentially legal nature of the action. The questions involved [*i.e.*, contractual enforceability] are traditional common-law issues which can be and should have been submitted to a jury . . . ." 372 U.S. at 223.

the merits of their contact claim. *See N. Am. Specialty Ins. Co. v. Correctional Med. Servs. Inc.*, 527 F.3d 1033, 1038-39 (10th Cir. 2008) (in jurisdictional decision, holding that attorneys' fees and costs awarded as compensatory damages to insured are inseparable from merits of insured's breach of contract claim; distinguishing statutory prevailing party attorneys' fees, which are collateral to the merits). Simplot does not seek the fees "as an element of 'costs' awarded to the prevailing party," *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988), which "raises legal issues collateral to and separate from the decision on the merits." *Id.* (quotation marks and citations omitted). Rather, Simplot seeks the fees as the measure of *damages* resulting from Chevron's breach, "as an element of damages under a contract." 10 J. MOORE, *Moore's Federal Practice* § 54.171[1][a] (3d ed. 2008) (noting such fees may present "jury triable issues").

Rule 54 of the Federal Rules of Civil Procedure recognizes this distinction. *See* Fed. R. Civ. P. 54(d)(2)(A) ("A claim for attorney's fees and related nontaxable expenses must be made by motion *unless* the substantive law requires those fees to be proved *at trial as an element of damages*." (emphasis added)). The advisory committee's note to the 1993 Amendments of Rule 54(d)(2) explains further:

> This new paragraph establishes a procedure for presenting claims for attorneys' fees, whether or not denominated as "costs." It applies also to requests for reimbursement of expenses, not taxable as costs, when recoverable under governing law incident to the award of fees. *Cf. West Virginia Univ. Hosp. v. Casey*, 499 U.S. 83 (1991), holding,

prior to the Civil Rights Act of 1991, that expert witness fees were not recoverable under 42 U.S.C. § 1988. As noted in subparagraph (A), it does not, however, apply to fees recoverable as an element of damages, as when sought under the terms of a contract; such damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury.

This action is, at bottom, a legal action for compensatory damages resulting from a breach of contract. That the measure of damages happens to be attorneys' fees does not in and of itself change the nature of Simplot's claim.

While Simplot argues to the contrary, other Circuits' decisions addressing contractual attorneys' fees are distinguishable and do not support its contention. In *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1308 (2d Cir. 1993), the owner of a merged company sued to rescind the merger. The defendants counterclaimed, alleging, *inter alia*, that plaintiff had misrepresented the value of its stock and was also liable for breach of contract. *Id.* The jury awarded damages to defendants for fraud and for breach of contract, and determined, in response to a special verdict form, that the plaintiff owed the defendants' attorneys' fees under a contractual provision providing indemnification for "[a]ll costs . . . (including costs of defense . . . and reasonable attorney's fees) arising out of any claim . . . made with respect to" the merger agreement. *Id.* at 1309. The jury did not compute the amount of fees, however, and the defendants presented no evidence of attorneys' fees at trial. *Id.* The district court refused to award the fees. *Id.* The parties appealed, disputing whether the district court or the jury should have

-27-

decided the amount and reasonableness of any fee award. *Id.* at 1312.

The Second Circuit concluded that the district court should have ascertained the amount of fees due the prevailing party. *Id.* at 1316. "[W]hen a contract provides for an award of attorneys' fees, the jury is to decide at trial whether a party may recover such fees." *Id.* at 1313. Once the jury determines liability, "the judge is to determine a reasonable amount of fees." *Id.* The court reasoned that a contrary rule would be impractical and inefficient. *See id.* at 1316. "[T]he jury would have to keep a running total of fees as they accrued through summations and then predict future fees from post-trial proceedings and motions." *Id.*

The *McGuire* concurrence carefully limited the court's holding by noting the nature of the parties' action. The case did not involve "the availability of a jury trial for fees where . . . a claimant seeks contractual indemnification for fees incurred in a *separate litigation against a third party*." *Id.* at 1317 (Jacobs, J., concurring) (emphasis added). In that instance, the concurrence pointed out, Supreme Court precedent might require a jury trial for such a "free-standing" attorneys' fees claim. *Id.*

The Fifth and Seventh Circuits have agreed that the court – not the jury – should generally determine the amount of attorneys' fees in cases where a contract provides for fees to the prevailing party. The Fifth Circuit held the Seventh Amendment does not guarantee a jury trial to determine the amount of

reasonable attorneys' fees, as no common law right exists to recover attorneys' fees awarded pursuant to a contract. *Resolution Trust Corp. v. Marshall*, 939 F.2d 274, 279 (5th Cir. 1991). Applying a different rationale, the Seventh Circuit concluded "[t]he issue of attorneys' fees (including amount) [i]s [] an issue to be resolved after the trial on the basis of the judgment entered at the trial, just as in cases in which statutory rather than contractual entitlements to attorneys' fees are involved." *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 627 (7th Cir. 2000) (citations omitted). Yet each of these cases, like *McGuire*, share one significant distinguishing factor: none involves a "free-standing" breach of contract claim – as here – for attorneys' fees already incurred in a separate, underlying action against a third party.

This case is like an insurance case where the insurer has breached its duty to defend a lawsuit against the insured by a third party and the insured sues the insurer for payment of the costs of its defense, particularly attorneys' fees. *See*, *e.g.*, *A. Kush & Assoc., Ltd. v. American States Ins. Co.*, 927 F.2d 929, 932-34 (7th Cir. 1991) (issue of reasonable attorneys' fees as damages for failure to defend sent to the jury). In sum, we hold that Chevron has a Seventh Amendment right to a jury trial on the amount of attorneys' fees due Simplot as damages for Chevron's breach of its duty to defend Simplot in the Ashley Creek litigation.

Nevertheless, it was not *per se* error for the district court to deny a jury trial on the requested attorneys' fees and costs. Chevron concedes that the district

court "effectively granted summary judgment on the amount of damages."  Reply at 32.  The law is well-settled that summary judgment does not violate the Seventh Amendment.  *See Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 319-21 (1902).  The district court could grant summary judgment *sua sponte* on any and all aspects of Simplot's claim, including damages, if there were no genuine issues of material fact, *see* Fed. R. Civ. P. 56(d), and Chevron had notice of its duty to proffer all evidence, *see Jones v. Salt Lake County*, 503 F.3d 1147, 1152 (10th Cir. 2007).  In this case, Utah law guides our review of the "substantive dimension" of Simplot's damages claim.  *Simler*, 372 U.S. at 222.

Chevron contends the district court should not have granted summary judgment because Simplot did not establish that its damages were reasonable. Chevron notes that it "identified numerous instances of unreasonable billing practices, thereby generating genuine disputes of fact that only a jury could resolve."  Aplt. Br. at 61.  These alleged "unreasonable" billing practices include (i) "duplicative, unnecessary, or vague" charges by the three law firms representing the Simplot entities and (ii) $18,897 in attorneys' fees allegedly unrelated to the defense of the Ashley Creek litigation.  Chevron contends damages must be reasonable because otherwise an indemnitor could be potentially liable for a limitless amount of attorneys' fees and costs.  According to Chevron, Utah law reads an implied requirement of reasonableness into every indemnity agreement notwithstanding the contractual terms.

-30-

Simplot, by contrast, argues that a dispute about the reasonableness of its damages does not constitute a genuine issue of material fact. It points out that the Agreements do not require the breaching party to pay only "reasonable" fees, but rather require reimbursement of all costs and expenses that Simplot "deem[ed] appropriate" in defending against Ashley Creek's claims. Aple. Br. at 37.[11] Simplot argues it did not have a burden to show that its fees were reasonable; it only had to show that they were incurred in the Ashley Creek litigation. Even if Simplot did have such a burden, it adds, Chevron did not challenge the billing rates, provide expert testimony that the requested fees were unreasonable, or provide expert testimony that the charges of each law firm were duplicative. Finally, regarding Chevron's specific challenge to $18,897 in fees, Simplot notes it produced uncontested declarations of counsel stating that $15,864 of these fees related to discovery in the Ashley Creek litigation. The $3,033 remaining, Simplot contends, is attributable to outside counsel's preparation of audit response letters and litigation budgets.

---

[11] In asserting this argument, Simplot relies on section 11.3:

> If the indemnifying party does not assume sole control over the defense or settlement of such claim . . ., the indemnified party shall have the right to defend and settle the claim in such manner as it may deem appropriate at the cost and expense of the indemnifying party, and the indemnifying party shall promptly reimburse the indemnified party . . . .

5 Aplt. App. at 1325; *accord* 6 Aplt. App. at 1495-96.

We conclude the district court's decision suffers from a fatal flaw that requires us to reverse:  the court did not apply the correct standard in granting summary judgment.  Relying on *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1548 (10th Cir. 1987), the court summarily held (i) it had a duty to enforce the parties' benefit of their contractual attorneys' fees bargain, (ii) it would reduce the fee award only if Simplot's request was "inequitable or unreasonable," and (iii) it was "*not responsible for independently calculating a reasonable fee award.*"  Rec., vol. 20 at 5540 (emphasis added).  The district court erred in determining that it was not obligated to assess the reasonableness of Simplot's attorneys' fees request.

*Western States* involved a subcontractor's breach of contract claim under the Miller Act, 40 U.S.C. § 270, against a general contractor and its Miller Act surety.  *See* 834 F.2d at 1536-39.  The contract provided the general contractor would "pay all attorney's fees and collection expenses" should the subcontractor need to refer the account for collection.  *Id.* at 1547.  The district court reduced the requested attorneys' fees of $13,538.72 to $4,885.37, which the subcontractor appealed as inadequate.  *Id.*  We reversed, explaining the difference in standards between an award of fees to a prevailing party pursuant to a statute and an award as damages pursuant to a contract:

> Close scrutiny of awards under federal fee-shifting statutes is justified because these statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were

they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.

> . . . .
> In contrast, where contracting parties have agreed that a breaching party will be liable for attorneys' fees, the purpose of the award is to give the parties the benefit of that bargain, and the court's responsibility is to enforce that bargain. Normally, where the court is merely enforcing a contractual provision authorizing attorneys' fees, the fees are routinely awarded and the contract is enforced according to its terms.

*Id.* at 1548. We concluded that "the trial court's role [with respect to contractual attorneys' fees] is to determine if the claimed fees are inequitable or unreasonable." *Id.* at 1549.

As we recently noted in *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1228 (10th Cir. 2009), however, the standards for assessing attorneys' fees set out in *Western States* are not as different as they might appear. "Under either standard, the district court analyzes the fee award using essentially the same factors. The chief difference appears to be who bears the burden of proof on the question of reasonableness." *Id.* Application of the *Western States* ruling "requires fee awards to be upheld unless the payor proves they are unreasonable or inequitable." *Id.* We also made clear in *Westar Energy* that state law determines the attorneys' fees standard to be applied to the type of contract damages we have here. *See id.* at 1227-28.

The district court did not determine what standards Utah would apply to the

-33-

attorneys' fee claim here.  We therefore turn to that issue.  Utah law provides that a genuine dispute about the reasonableness of an indemnitee's attorneys' fees precludes summary judgment.  The Utah Supreme Court has held that "[i]n general, where an insurer breaches its duty to defend, the insured is entitled to recover the amount it paid for *reasonable* attorney fees."  *Sharon Steel Corp. v. Aetna Casualty & Surety Co.*, 931 P.2d 127, 139 (Utah 1997) (emphasis in original).  In determining reasonableness, the court noted, a court should consider several factors, including:

> the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved.

*Id.* at 140 n.17 (quotation marks omitted).  The court in *Sharon Steel* also quoted *IMCERA Group, Inc. v. Liberty Mut. Ins. Co.*, 50 Cal. Rptr. 2d 583, 603 (Cal. Ct. App. 1996), for the proposition that "[w]here an insurer wrongfully refuses to provide a defense, it is manifestly bound to reimburse its insured for the full amount of any obligation reasonably incurred by him . . . . If there be uncertainty as to the nature or extent of the services reasonably to be rendered by counsel engaged by the insured, the uncertainty must be resolved against the insurer."  *Id.* at 139 (quotation marks omitted).  In addition, under Utah law, the party owing attorneys' fees in this context has the burden of proving unreasonableness.  *See Church of Jesus Christ of Latter-Day Saints v. Hartford Accident & Indem. Co.*,

95 P.2d 739, 746 (Utah 1939) (holding surety must show non-breaching party's damages are wasteful, extravagant, unnecessary, or claimed in bad faith).

Because the district court concluded it was not obligated to assess the reasonableness of Simplot's request, we reverse and remand the attorneys' fees issue for resolution consistent with this opinion. To recap, the district court on remand should determine whether Chevron has raised any genuine issue of material fact regarding Simplot's damages. Such issues may include factual disputes about the cause or reasonableness of Simplot's attorneys' fees. The court must present to a jury any portion of Simplot's damages claim that cannot be resolved as a matter of law.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment on the breach of contract claim and the breach of implied covenant of good faith and fair dealing counterclaim. We **REVERSE** the district court's judgment awarding attorneys' fees, costs, and interest, and **REMAND** this case to the district court for resolution of Simplot's damages consistent with this opinion.