2013 COA 131

**STRESSCON CORPORATION, a Colorado corporation, Plaintiff–Appellee and Cross–Appellant,**

v.

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut company, Defendant–Appellant and Cross–Appellee.**

Court of Appeals Nos. 11CA1239 & 11CA1582

Colorado Court of Appeals, Div. VII.

Announced September 12, 2013

Sherman & Howard L.L.C., Bret R. Gunnell, Katherine D. Varholak, Brooke Yates, Matthew O. Stromquist, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant

Montgomery, Kolodny, Amatuzio & Dusbabek, LLP, Kevin Amatuzio, David Fawley, Denver, Colorado; Meckler Bulger Tilson Marick & Pearson, Michael M. Marick, Chicago, Illinois, for Defendant–Appellant and Cross–Appellee

Roberts Levin Rosenberg, PC, Michael J. Rosenberg, Denver, Colorado, for Amicus Curiae The Colorado Trial Lawyers Association

Reubel & Quillen, LLC, Jeffrey Reubel, Casey A. Quillen, Westminster, Colorado, for Amicus Curiae Colorado Defense Lawyers Association

Opinion by JUDGE BERNARD

¶ 1 Along with other issues, the defendant, Travelers Property Casualty Company of America (the insurance company), raises a question in this appeal concerning "no voluntary payment" clauses. These clauses appear in many insurance policies. They prohibit insureds from voluntarily settling claims and making payment, or from assuming certain expenses, without the insurer's consent, at the risk of losing insurance benefits.

¶ 2 The question we must resolve in this appeal is whether an insured's breach of a "no voluntary payment" clause will always bar the insured from receiving benefits. We answer that question "no."

¶ 3 We base our answer on the notice-prejudice rule, which is described in cases such as *Friedland v. Travelers Indemnity Co.*, 105 P.3d 639, 643 (Colo.2005). The notice-prejudice rule provides that (1) if an insured does not provide the insurer with notice of a claim until after the insured has settled; then (2) the insured will lose benefits after the settlement based on a presumption of prejudice; *unless* (3) the insured rebuts the presumption that the insurer's interests were prejudiced by the lack of notice; *and*

(4) the insurer does not then prove that it was actually prejudiced by the lack of notice. For the reasons we explain below, we hold that the notice- prejudice rule applies to "no voluntary payment" clauses in insurance policies.

¶ 4 On cross-appeal, the plaintiff, Stresscon Corporation (the concrete company), challenges the trial court's decision to reduce its damages award under section 10–3–1116, C.R.S.2012, and the trial court's decision that certain damages were not covered by the insurance policy. The concrete company also challenges several of the trial court's decisions reducing the attorney fee award, one of which denied its request for the fees and costs it incurred in bringing the fee request, or its "fees-on-fees." We conclude that the trial court erred when it ruled that the concrete company was not entitled to reasonable "fees-on-fees," and we remand to the trial court to determine and to award such fees. We further conclude that none of the other trial court's decisions that are questioned by the concrete company on cross-appeal was erroneous.

¶ 5 Therefore, we reverse the part of the judgment in which the trial court denied the concrete company's request for "fees-on-fees," and we remand to the trial court to determine and award the concrete company its reasonable "fees-on-fees." We affirm the judgment in all other respects, and we remand the case so that the trial court can determine and award the concrete company's reasonable attorney fees incurred on appeal.

## I. Background

¶ 6 This case arose from a construction accident at the Fort Carson Army Base near Colorado Springs. In July 2007, one construction worker was killed and another was gravely injured when sections of a partially erected building collapsed on them. The collapse was caused by a crane hook catching a safety stanchion and pulling one of the concrete components off of its support beams.

¶ 7 The accident led to three lawsuits: (1) one brought by the estate of the deceased construction worker; (2) one brought by the injured worker; and (3) one brought by Mortenson (the general contractor) against the concrete company, its subcontractor, in which the general contractor claimed it was entitled to contract damages incurred because of the length of time that the project was delayed. The parties settled the personal injury lawsuits. This appeal concerns only the insurance company's handling of the general contractor's claim against the concrete company.

¶ 8 As is common in the construction industry, there were layers of contractors involved in this building project. The United States Corps of Engineers hired the general contractor. The general contractor then subcontracted with the concrete company to build pre-cast concrete components. The concrete company hired two sub-sub-contractors, RMS and Hardrock (the crane team), to work together to erect the components with cranes.

¶ 9 The concrete company and the crane team had liability insurance. The concrete company was insured by the insurance company, the defendant in this case. The crane team had primary and excess insurance policies with other insurers. The concrete company required that each of the primary insurance policies for the crane team name the concrete company as an additional insured.

¶ 10 A clause in the contract between the general contractor and the Corps of Engineers stated that the general contractor would be liable for any delay in the project, without regard to the cause of the delay. After the accident, the general contractor notified the concrete company that it expected to be reimbursed for the damages resulting from the delay to the project. The concrete company then informed the insurance company of this claim.

¶ 11 The insurance company responded by sending two reservation-of-rights letters to the concrete company, stating that its policy might not cover the delay damages sought by the general contractor. Later, the insurance company sent a letter to the general contractor on behalf of the concrete company. This letter denied that the concrete company was liable to the general contractor. At this point, the general contractor entered into settlement discussions with the concrete company.

¶ 12 After this series of letters, the general contractor and the concrete company settled

their dispute. The concrete company did not, before entering into the settlement, inform the insurance company of the settlement or obtain its consent. The settlement reimbursed the general contractor for the delay damages caused by the accident and for other unrelated damages resulting from the accident that clearly were not covered by the concrete company's insurance policy. Neither party attempted to allocate the settlement between these two categories of damages.

¶ 13 Months later, the concrete company sued the insurance company, along with the crane team and its insurers. This was the first time that the insurance company learned of the settlement. The concrete company asserted that the crane team had breached its contract with the concrete company and that the crane team owed it indemnification for the delay damages that it had paid the general contractor.

¶ 14 In addition to its claims for breach of contract and indemnification against the crane team, the concrete company asserted that, as is pertinent here, the insurance company had, in bad faith, breached its duty to the concrete company and, as a result, had violated section 10–3–1115(1)(a), C.R.S.2012, by "unreasonably delay[ing] or den[ying]" its claim for benefits. The concrete company alleged that it was due the statutory penalty of "reasonable attorney fees and court costs and two times the covered benefit." *See* § 10–3–1116(1), C.R.S.2012.

¶ 15 The trial court bifurcated this case into two phases: (1) the trial against the crane team to determine liability and damages; and (2) the trial against the insurance company and the other insurers on the contractual, bad faith, and section 10–3–1115 and –1116, C.R.S.2012, claims.

¶ 16 The jury in the first trial found that the crane team was liable to the concrete company for $678,826, the amount of damages that the general contractor, and therefore the concrete company, had suffered as a result of the accident. The results of the first trial were not appealed. The insurer for one member of the crane team settled with the concrete company and paid it this amount.

¶ 17 The second trial involved only the insurance company. The jury was asked (1) to decide whether the insurance company had acted unreasonably in denying the concrete company's claim for benefits to cover the amount that it had paid to the general contractor; (2) to decide whether the insurance company had suffered prejudice as a result of the concrete company's settlement with the general contractor; and (3) to apportion the first jury's award among categories of damages, some of which the trial court had already determined were not covered by the insurance policy.

¶ 18 The jury found that the insurance company had unreasonably denied the concrete company's claim, that the insurance company had not been prejudiced by the settlement, and that $546,899 of the first jury award represented the damages that were covered by the insurance policy.

¶ 19 In accordance with section 10–3–1116, the trial court determined that the insurance company would ordinarily be required to pay the concrete company two times the covered benefit, or $1,093,798. However, the trial court ordered the insurance company to pay the concrete company only $546,899. The court determined that the figure of $1,093,798 should be halved because (1) the jury in the second trial had found that only $546,899 of the award of $678,826 made by the jury in the first trial was covered by the insurance company's policy; and (2) a clause in the insurance policies issued by both the insurance company and the insurer for a member of the crane team barred the concrete company from recovering from both insurers.

¶ 20 The trial court also awarded attorney fees to the concrete company, but reduced the award by twenty percent to reflect time and effort that the concrete company had wasted by not clarifying whether its claims against the crane team were grounded in tort or in contract. The court denied the concrete company the attorney fees and costs, or the "fees-on-fees," that it had incurred in bringing the fee request.

¶ 21 The member of the crane team that did not settle with the concrete company and the insurance company appealed the judg-

ment in this case. After filing its opening brief, the member of the crane team settled with the concrete company and voluntarily dismissed its appeal. Thus, this appeal involves only issues raised by the insurance company and the concrete company.

### The Insurance Company's Appeal

## II. The Insurance Company Had a Duty to Pay Benefits to the Concrete Company

### A. Standard of Review

■ ¶ 22 The insurance company appeals the trial court's denial of its motion for directed verdict and for a judgment notwithstanding the verdict. We review this issue de novo. *Vaccaro v. Am. Family Ins. Grp.,* 2012 COA 9, ¶ 16, 275 P.3d 750. Like the trial court, we "must determine whether there is any evidence of sufficient probative force to support the trial court's findings." *Hall v. Frankel,* 190 P.3d 852, 862 (Colo.App. 2008). "We consider all the evidence in the light most favorable to the nonmoving party and indulge every reasonable inference that can be drawn from the evidence in that party's favor." *Id.* A directed verdict or a judgment notwithstanding the verdict "should be granted only if the evidence, viewed in the light most favorable to the nonmoving party, is such that no reasonable person could reach the same conclusion as the jury." *Id.*

¶ 23 To the extent that the insurance company asks us to review the trial court's legal rulings concerning the issue of prejudice or the interpretation of the insurance policy, our review is de novo. *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 613 (Colo.1999) ("The interpretation of an insurance contract is a matter of law which we review de novo."); *Levy v. Am. Family Mut. Ins. Co.,* 293 P.3d 40, 43 (Colo.App.2011).

### B. The Trial Court Properly Refused to Hold that the Insurance Company Was Prejudiced as a Matter of Law

¶ 24 The insurance company asserts two reasons why it was entitled to judgment as a matter of law. First, it argues that the notice-prejudice rule adopted in *Friedland* does not apply to breaches of "no voluntary payment" clauses. Second, it argues that

insurers are prejudiced as a matter of law whenever an insured settles with a third party claimant before that third party has filed a lawsuit. Based on these reasons, the insurance company argues that it never had a duty to pay benefits to the concrete company. Therefore, it could not have unreasonably delayed or denied paying the concrete company benefits under the insurance policy.

¶ 25 We disagree with the insurance company because we conclude that (1) the notice-prejudice rule should apply in these circumstances; (2) an insured's pre-litigation settlement with a third party does not conclusively establish that an insurer was prejudiced; and (3) sufficient evidence was presented at trial to support the jury's finding that the insurance company was not prejudiced.

### 1. The Notice–Prejudice Rule

■ ¶ 26 Colorado does not strictly enforce notice-of-claim language in insurance policies unless the lack of notice from the insured prejudiced the insurer. *See Friedland,* 105 P.3d at 646 (applying the notice-prejudice rule to notice-of-claim clauses in liability policies); *Clementi v. Nationwide Mut. Fire Ins. Co.,* 16 P.3d 223, 230 (Colo.2001)(applying the notice-prejudice rule to notice-of-claim clauses in underinsured motorist policies). Under *Friedland,* if an insured breaches the insurance policy by failing to provide the insurer with notice of a claim that the insured has settled with a third party, there is a presumption that the insurer has been prejudiced. *Friedland,* 105 P.3d at 648.

¶ 27 As a general rule, *Friedland*'s notice-prejudice rule addresses three public policy concerns: "(1) the adhesive nature of insurance contracts, (2) the public policy objective of compensating tort victims, and (3) the inequity of an insurer receiving a windfall ... due to a technicality." *Id.* at 645–46.

¶ 28 Although *Friedland* only discussed an insured's failure to give notice of a claim, in *Lauric v. USAA Casualty Insurance Co.,* 209 P.3d 190, 193 (Colo.App.2009), a division of this court, in an underinsured motorist case, relied on *Friedland* to conclude that the notice-prejudice rule applies to "consent to

settle" policy clauses that are similar to the "no voluntary payment" clause at issue here.

¶ 29 The division reasoned that

forfeiting insurance benefits when the insurer has not suffered any prejudice would be a disproportionate penalty and provide the insurer a windfall based on a technical violation of the policy. We note that in *Friedland* the "technicality" at issue – failure even to give notice of claim until after settlement—was more substantial than in this case, where the insureds did give timely notice of the claim.

*Id.* In other words, the division in *Lauric* concluded that a violation of a "consent-to-settle" clause after an insurer has received notice of a claim is, at least as a general proposition, less prejudicial to an insurer than a violation of a clause requiring notice of a claim. *Id.*

¶ 30 When the issue involves only untimely notice, the trial court must "determine[ ] whether the notice was untimely and the delay was unreasonable." *Friedland,* 105 P.3d at 647 (citing *Clementi,* 16 P.3d at 231). "[I]f so, the trial court addresses whether the insure[r] was prejudiced by such untimely notice," placing the burden on the insurer. *Id.*

¶ 31 However, *Friedland* sets out a different burden-shifting procedure for applying the notice-prejudice rule in cases like the present one. When the insured does not provide the insurer with notice until after a liability case is settled, the insurer is placed at a significant disadvantage. For example, it will not be able to protect its interests by investigating a case before a suit is filed in order to reduce the likelihood that it will be required to appear in the lawsuit. *Id.* at 647–48. In such circumstances, the law presumes that the insurer has been prejudiced. *Id.* at 648. Following this procedure:

1) "[T]here is a presumption of prejudice to the insurer in instances where the insured provides notice after disposition of the liability case[.]"
2) "[T]he insured has the burden of going forward with evidence to dispel this presumption[.]"
3) "[I]f such evidence is presented, the presumption loses any probative force it may have[.]"

4) "[I]t is then up to the insurer to go forward with the evidence that actual prejudice existed."

*Id.*

¶ 32 If the insured rebuts the presumption of prejudice, the insurer must show by a preponderance of the evidence that it was actually prejudiced to prevail on its late notice defense. *Id.* at 649. The types of evidence that an insured can introduce to rebut a presumption of prejudice include proof that (1) the insured obtained "all material information that could have been obtained" in the course of reaching a settlement; (2) the insured raised all legitimate defenses; (3) the insured's liability was "reasonably clear under the facts and the law"; and (4) the insurer, "had it received notice, could not have obtained any materially better outcome" than the insured achieved without the insurer's assistance. *Id.* at 648.

¶ 33 Ultimately, if the insured rebuts the presumption, the insurer must prove

the precise manner in which its interests have suffered, meaning that an insurer must show not merely the possibility of prejudice, but, rather, that there was a substantial likelihood of avoiding or minimizing the covered loss, such as that the insurer could have caused the insured to prevail in the underlying action, or that the insurer could have settled the underlying case for a small sum or smaller sum than that for which the insured ultimately settled the claim.

*Id.* at 648 n. 5 (quoting Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 193:29 (3d ed. 1999 & Supp.2004)).

2. *Friedland's* Notice–Prejudice Rule Applies to "Consent to Settle" and "No Voluntary Payment" Clauses

¶ 34 The "no voluntary payment" clause in the insurance policy in this case states that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense ... without our consent." We reject the insurance company's argument that *Friedland's* notice-prejudice rule applies only to violations of an insurance policy's notice of claim clause, and not to "no volun-

tary payment" clauses like the one that we analyze in this case.

¶ 35 First, *Friedland* contemplated the situation we face here. The policy at issue in *Friedland* contained a "no voluntary payment" clause that is substantially the same as the one before us. *Id.* at 642. The policyholder there litigated and settled an environmental lawsuit without his insurance company's cooperation or consent, violating both the notice-of-claim and "no voluntary payment" clauses. *Id.* at 640–43. After the settlement, the policyholder then sued his insurer for benefits. *Id.*

¶ 36 The insured's act of settling the case was clearly part of the supreme court's analysis. For example, when describing its holding, the court stated that

> [a]lthough we adopt the notice-prejudice rule for liability policies, in the case before us the insured gave notice of claim and suit to the insurer *after the insured had defended and settled the case. In such a circumstance,* the delay is unreasonable as a matter of law and the insurer is presumed to have been prejudiced by the delay. However, the insured must have an opportunity to rebut the presumption of prejudice . . . .

*Id.* at 641 (emphasis added); *see also id.* at 643.

¶ 37 Indeed, the supreme court made clear that the insured's settlement was *the* reason for the creation of a presumption of prejudice in favor of the insurer.

> In *Clementi,* we adopted a two-step approach applicable to cases involving late notice by an insured to an insurer [in a UIM case]. The trial court determines whether the notice was untimely and the delay was unreasonable; if so, the trial court addresses whether the insured was prejudiced by such untimely notice. In the prejudice phase, we rejected "the presumption of prejudice approach in favor of placing the burden on the insurer to demonstrate that it was prejudiced." We now add a third step for instances where the late notice occurs *after the insured's settlement of the liability case* ; we adopt a presumption of prejudice in favor of the insurer in such cases.

Unlike the insured[ ] in *Clementi* . . . Friedland gave notice after he had defended and settled the litigation. Accordingly, under the circumstances of this case, Friedland's delay was unreasonable as a matter of law, and we presume that [the insurer] has been prejudiced by the late notice.

*Id.* at 647 (emphasis added)(quoting *Clementi,* 16 P.3d at 232).

¶ 38 In other words, once an insured has settled a case, an insurer is denied the opportunity to take steps to protect its interests: "where notice is not given until after settlement, we must assume that the insurer had none of these opportunities; thus, prejudice must be presumed." *Id.* at 648.

¶ 39 Second, as noted, a division of this court has held that the notice-prejudice rule applies to "consent-to-settle" clauses in underinsured motorist cases. *Lauric,* 209 P.3d at 193. The division concluded that our supreme court, "as evidenced by the decision in *Friedland* . . . , would apply the notice-prejudice rule to an insured's failure to notify the insurer of, and obtain its consent to, a settlement with a tortfeasor in [an underinsured motorist] case." *Id.* Part of the division's reasoning was based on its observation that *Friedland* involved a case in which there was "failure . . . to give notice of the claim until after settlement." *Id.*

¶ 40 Although the present case does not involve underinsured motorist coverage, we conclude that the reasoning in *Lauric* applies equally well here. We see no reason to depart from the reasoning in *Lauric,* especially because both "consent-to-settle" and "no voluntary payment" clauses impose essentially the same duty on the insured: to obtain the insurer's consent before it enters into any settlement or voluntary payment that implicates coverage.

¶ 41 Third, there is substantial authority that persuades us that we should apply our supreme court's reasoning in *Friedland* to "no voluntary payment" clauses. This authority includes:

● Cases that hold, in underinsured motorist cases, that the violation of a clause requiring the insurer's consent before

settling a claim does not bar recovery of benefits unless the insurer was prejudiced by the settlement. *See, e.g., Muth v. AIU Ins. Co.*, 982 So.2d 749, 752 (Fla.Dist.Ct.App.2008)("[F]ailure to obtain an insurer's consent prior to settlement does not prohibit recovery for uninsured/ underinsured motorist benefits if the settlement did not prejudice the insurer."); *Beal v. Allstate Ins. Co.*, 989 A.2d 733, 745 (Me.2010)("If [the insurer] did not consent to the settlement, then [the insured] could still be entitled to recover [underinsured motorist] benefits unless [the insurer] could 'demonstrate prejudice as a result of the loss of subrogation rights' 'from the insured's failure to obtain the insurer's consent before settling with the tortfeasor.'" (quoting *Greenvall v. Me. Mut. Fire Ins. Co.*, 715 A.2d 949, 954 (Me.1998))); *State Farm Mut. Auto. Ins. Co. v. Fennema*, 137 N.M. 275, 110 P.3d 491, 492 (2005)("[W]e hold that for an insurer to justify foreclosing an insured's right to underinsured motorist benefits, the insurer must demonstrate it was substantially prejudiced by the insured's breach of the consent-to-settle provision."); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex.1994) ("We hold that an insurer may escape liability on the basis of a settlement-without-consent exclusion only when the insurer is actually prejudiced by the insured's settlement with the tortfeasor.").

● Cases that hold, in liability cases like this one, that an insurer must prove that it was prejudiced by the insured's conduct before it will be relieved of its obligation to indemnify the insured, although these cases do not incorporate a presumption that the violation of a "no voluntary payment" clause prejudices the insurer. *See, e.g., MidMountain Contractors, Inc. v. Am. Safety Indem. Co.*, 893 F.Supp.2d 1096, 1111 (W.D.Wash.2012)("Under Washington law, where an insured breaches a ... 'voluntary payment' clause of an insurance policy, the insurer is not relieved of its duties under the insurance policy unless it can show that ... the voluntary payment caused it 'actual and substantial prejudice.'" (quoting *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wash.2d 411, 191 P.3d 866, 876 (2008))); *Ins. Co. of N. Amer. v. McCarthy Bros. Co.*, 123 F.Supp.2d 373, 378–80 (S.D.Tex.2000)(applying Texas law; when a general contractor settled a construction defect claim against it before it informed its insurers of the suit, the court required that the insurer establish prejudice as a prerequisite to enforcing a "consent to settle" clause); *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 236 P.3d 421, 433–34 (App.2010)(insurer cannot deny coverage under a "no voluntary payment" clause because insured paid costs of repair unless insurer can establish prejudice); *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 321 Ill.App.3d 622, 254 Ill.Dec. 543, 747 N.E.2d 955, 968 (2001) ("An insurer seeking to avoid responsibility because of a breach of [a no voluntary payment] clause must show prejudice."); *Bond/Tec, Inc. v. Scottsdale Ins. Co.*, 174 N.C.App. 820, 622 S.E.2d 165, 168 (2005)("[W]e conclude an insurer must show prejudice where the insured has breached the voluntary payments clause of the parties' insurance contract.").

● Cases that hold, in liability cases like this one, that a violation of certain clauses creates a rebuttable presumption of prejudice. *See Simpson v. U.S. Fid. & Guar. Co.*, 562 N.W.2d 627, 631–32 (Iowa 1997)( "If an insured fails to prove substantial compliance [with a "cooperation clause"], excuse, or waiver, prejudice to the insurer is presumed. Although this presumption is rebuttable, it will defeat an insured's recovery unless it is overcome by a satisfactory showing of lack of prejudice. The burden to show actual prejudice does not shift to the insurer until the insured has satisfactorily shown excuse or legal justification, such as reasonable mistake or trivial occurrence." (citations omitted)); *Roberts Oil Co. v. Transamerica Ins. Co.*, 113 N.M. 745, 833 P.2d 222, 231 (1992) ("[W]hile ... the insured's failure to comply with [a "no voluntary payment" clause] ...

may give rise to a presumption of prejudice to the insurer, the presumption is rebuttable. Rebutting it can be achieved by producing evidence that the insured was not in fact prejudiced. . . . [Thus, such a breach of the "no voluntary payment" clause] does not discharge the insurer absent a showing that the insurer has been substantially prejudiced.").

¶ 42 We also recognize that there are cases from other jurisdictions that hold differently, concluding that violations of "no voluntary payment" clauses do not require a showing of prejudice before an insurer may refuse to pay benefits. *See, e.g., Low v. Golden Eagle Ins. Co.,* 110 Cal.App.4th 1532, 2 Cal.Rptr.3d 761, 771 (2003)("[U]nlike a notice provision or a cooperation clause, [a "no voluntary payment"] provision can be enforced without a showing of prejudice." (quoting *Truck Ins. Exch. v. Unigard Ins. Co.,* 79 Cal.App.4th 966, 94 Cal.Rptr.2d 516, 524 (2000))). The California Court of Appeals explained the reasoning that supported its position. "No voluntary payment" clauses

> are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim. That means insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. . . . [T]he decision to pay any remediation costs outside the civil action context raises a 'judgment call left solely to the insurer. . . .' In short, the provision protects against coverage by fait accompli.

*Id.* at 770–71 (quoting *Jamestown Builders, Inc. v. Gen. Star Indem. Co.,* 77 Cal.App.4th 341, 91 Cal.Rptr.2d 514, 517 (1999)); *see also Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 571 N.E.2d 357, 360–61 (1991) (after insured voluntarily settled without the insurer's knowledge, it was "too late for the insurer to act to protect its interests" and therefore no showing of prejudice was required); *Tenneco Inc. v. Amerisure Mut. Ins. Co.,* 281 Mich.App. 429, 761 N.W.2d 846, 870–71 (2008)(insurer was not required to show prejudice to void coverage once insured violated "no voluntary payment" clause).

¶ 43 But we find the following rationale for applying the notice-prejudice rule to "no voluntary payment" clauses, found in *Roberts Oil Co.,* to be persuasive.

> [W]e do not believe that the policy considerations underlying a voluntary payment provision differ significantly from the policy considerations underlying a cooperation clause. The purposes of a voluntary payment provision are to "obviate the risk of a . . . collusive combination between the assured and the injured third party" and to "restrain the assured from voluntary action materially prejudicial to the insurer's contractual rights." These purposes achieve the same general objectives as the purposes of a cooperation clause.

833 P.2d at 229 (citations omitted)(quoting *Kindervater v. Motorists Cas. Ins. Co.,* 120 N.J.L. 373, 199 A. 606, 608 (N.J.Err. & App. 1938)).

¶ 44 This analysis led the *Roberts Oil Co.* court to a conclusion that we likewise find persuasive.

> [E]ven when there has been a substantial and material breach of the insured's obligation and a resulting failure of a condition precedent to the insurer's liability, that breach and nonoccurrence of condition do[ ] not discharge the insurer absent a showing that the insurer has been substantially prejudiced.

*Id.* at 231.

¶ 45 Further, "forfeiting insurance benefits when the insurer has not suffered any prejudice would be a disproportionate penalty and provide the insurer a windfall based on a technical violation of the policy." *Lauric,* 209 P.3d at 193.

¶ 46 Therefore, we hold that the trial court properly applied the notice-prejudice rule in this case.

### 3. The Insurance Company's Proposed Bright–Line Rule Conflicts with the Notice–Prejudice Rule

¶ 47 We reject the insurance company's argument that the notice-prejudice rule is inapplicable *per se* because the concrete company settled with the general contractor before the general contractor filed a lawsuit.

Relying on *Kesinger v. Commercial Standard Insurance Co.*, 101 Colo. 109, 112, 70 P.2d 776, 778 (1937), the insurance company proposes a bright-line rule that renders all pre-suit settlements prejudicial as a matter of law. *Kesinger* denied policy benefits to an insured because "if [the insured] wished to avail himself of the protection of the policy, it was incumbent on him to give notice to the company, as he did, and on receipt of its answer, as appears, to remain inactive pending action in court against him." *Id.*

¶ 48 *Kesinger*, however, reflects the traditional bright-line rule that *Friedland* and *Clementi* expressly rejected in favor of a case-by-case analysis. *See Friedland*, 105 P.3d at 648 ("[T]he insured, despite having made a unilateral settlement without notice to the insurer, must have an opportunity to rebut this presumption of prejudice *based on the specific facts of the case*, before a trial court may bar the insured from receiving coverage benefits." (Emphasis added.)).

¶ 49 Nothing about the pre-suit nature of a settlement renders it any less trustworthy than the post-lawsuit settlement considered in *Friedland*. In both circumstances, the insured party has admitted liability and/or agreed to settle the claim or the lawsuit without the insurer's participation. Without regard to whether the third party has yet filed a suit, such a settlement deprives the insurer of the opportunity to "investigate the claim, present legitimate defenses to its insured's liability, and be involved in settlement negotiations." *Id.*

¶ 50 Even assuming, for the purposes of argument, that, without a bright-line rule, policyholders and third parties will be tempted to collude to "set up" insurers, we conclude that the presumption of prejudice, and the insurer's opportunity to prove prejudice if the insured overcomes the presumption of prejudice, provide ample protection against this putative risk. *See id.* at 647–48.

### 4. Sufficient Evidence Supported the Jury's Verdict

¶ 51 We construe the insurance company's remaining arguments as challenges to the sufficiency of the evidence supporting the jury's verdict. Therefore, we must "determine whether there is any evidence of sufficient probative force to support the [jury's]

findings." *Hall*, 190 P.3d at 862. We recognize that the insurance company contested much of this evidence, but, for the purposes of the analysis of this issue, we must "consider all the evidence in the light most favorable to the nonmoving party [here, the concrete company] and indulge every reasonable inference that can be drawn from the evidence in that party's favor." *Id.*

¶ 52 As indicated above, prejudice was presumed because the concrete company settled the case without informing the insurance company. *See Friedland*, 105 P.3d at 647–48. The concrete company then presented evidence to overcome this presumption, including the following:

- The concrete company's liability to the general contractor was "reasonably clear," *see id.* at 648, because it owed damages to the contractor for the project's delay under the parties' construction contract.

- The concrete company's chairman testified that:
  - It was "expensive for [the general contractor] to operate a job site ... so whenever you cause an incident that's going to result in delay, you know it's going to get expensive."
  - "[T]he building fell down, so there was going to be a lot connected with that.... I became quite alert to the fact that [the general contractor] was going to come after us as hard as [it] could."
  - "I felt that I had a legal contractual obligation to [the general contractor] to settle out the ... project with them. It was the normal course of business."

- The director of operations for the general contractor testified that:
  - The concrete company was responsible for the "disruption ... the effect on the plan ... [and] the flow of the work."
  - The accident was a "violation of the terms of the contract" between the general contractor and the concrete company because the accident "impacts the project schedule, [and] our

agreement is based upon a schedule, and ... if [the concrete company is] performing the work in such a way that it hinders our ability to move forward with the project, then [the concrete company is] obligated to compensate for that, whether that's through accelerating their own work or re-sequencing their work or paying costs associated with other contractors to make up for their default."

• The general contractor incurred costs associated with the accident, "such as securing the site, evidence preservation, moving the evidence to a new yard, dealing with [the Occupational Safety and Health Administration], bringing in people to help us like a scheduler, legal representation ... demolish[ing] the site, demolish[ing] parts of the foundations and re-build[ing] the foundations [and] ... experience[ing] delay to some of the progress of the work."

• The general contractor expected the concrete company to pay these extra costs, even if there had not been a contract between the general contractor and the concrete company, because the concrete company had "knocked the building down that was under construction and caus[ed] a disruption to our project."

• The general contractor had written the concrete company letters outlining the "type of damages that were going to be incurred as a result of the accident."

• The concrete company had "the responsibility to reimburse [the general contractor] for those damages [because the concrete company] was responsible for the accident."

• The concrete company was responsible for supervising the work of the crane team "at the time of the accident."

● The insurance company's second vice president of complex claims testified that the contract between the general contractor and the concrete company created "legal obligations that a court of law can enforce."

● The concrete company obtained all material information that was necessary to analyze the contractor's claim. *See id.*

● The director of operations for the general contractor testified that:

• The concrete company asked for backup documentation of the costs of the delay, including "meeting minutes and subcontractor subcontracts and payment applications and ... lots of documentation to back up the cost basis and the delay."

• He gave the concrete company a "claim document," which contained a description of the accident and of the effect that it had on the work and many pages of accounting "breakouts" that detailed the costs that the general contractor had incurred as a result of the accident.

• These documents quantified "most of the delay costs and things of that nature."

• In addition, he met with the concrete company "over a period of time and ... provid[ed] lots and lots of documentation of the costs, as well as our schedules, for [the concrete company's expert] to use in analyzing the project."

• Part of this documentation was a "big stack of documents" that was "probably a banker's box full of documents."

• He believed that the general contractor provided information to the concrete company in response to all its requests.

● The concrete company's chairman testified that:

• The concrete company received a great deal of information from the general contractor.

• The general contractor "respected my need to have information, and I think [it was] honoring those needs more or less. [The general contractor] provided us good access to the other subcontractors that were involved with claims, and [it was], I think, supportive of our interest to get

that information even though the other subcontractors may not have been as forthcoming as I would have liked them to be initially."

• The general contractor designated an employee to provide the concrete company with information. This employee provided the "data" that the concrete company had requested "in every different form and style that we asked for."

• The settlement represented an arm's-length transaction after negotiations. It was reasonable, and the insurance company would not have achieved a result that was "materially better." *See id.*

   ● The chairman of the concrete company testified that:

      • The settlement with the general contractor occurred at the "last best opportunity to settle ... at a minimum cost and exposure to" the concrete company.

      • If the settlement had not been reached at that time "everything would have gone very, very badly."

      • If the concrete company had not settled with the general contractor, it would no longer be able to do business with the general contractor because it has "a corporate policy that [it does not] do business with people that [it is] in litigation with."

      • The concrete company might have also jeopardized its ability to do business with other contractors if it had not settled.

   ● The director of operations for the general contractor testified that:

      • The amount of the settlement was "significantly less than the [amount] of the dela[y] plus accident claims."

      • If the general contractor had not settled with the concrete company, then the two parties would be required to engage in arbitration, which would have "cost [the general contractor] a lot more money than [it] would be willing to put at risk to eventually get to a settlement."

      • The concrete company did not "overpay" the general contractor in the settlement.

      • The general contractor was "not happy about the financial ramifications" of the settlement because "[i]t's still losing money," but the general contractor was "satisfied that the issue is behind" it.

   ● When the insurance company's second vice president of complex claims was asked whether the insurer "could have reached a better settlement with [the general contractor] had [the insurance company] been negotiating the ... claim rather than [the concrete company]," he replied, "I have no idea."

  ● The insurance company's adjuster in charge of the claim admitted that, even if his company had known about the settlement, it would not have participated in settlement negotiations or paid any part of the amount, because the insurance company believed that it was an excess insurer. This evidence suggests that, even if the concrete company had asked the insurance company to represent it in the settlement negotiations, the insurance company would have refused.

¶ 53 The insurance company was then required to prove, by a preponderance of the evidence, that it was actually prejudiced. *Id.* at 649. As indicated above, to prove prejudice, an insurer must establish the precise way in which its interests were damaged. This standard does not contemplate the mere possibility of prejudice. Instead, the insurer must show that there was a substantial likelihood that it could have avoided or reduced the insured's loss, or that it could have settled for less. *See id.* at 648 n. 5.

¶ 54 Prejudice is normally a question of fact, but it "may be determined as [a] matter of law where facts are not in dispute." 13 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 193:31 (3d ed.2012). One example of prejudice as a matter of law is a loss of evidence that deprives an insurer of an opportunity to investigate defenses, to "participate in remedial efforts, and to investigate possible claims against third parties." *Id.* (citing *Port Servs. Co. v. Gen. Ins. Co. of Am.,* 838 F.Supp. 1402, 1405 (D.Or.1993)); *see also id.* §§ 193:19 (Nature of "prejudice"

for Notice and Proof of Loss Purposes—Type of Showing Required); and 193:71 (Liability Insurance, Generally—Prejudice Found).

¶ 55 Here, the insurance company argues that it was prejudiced as a matter of law because (1) the settlement denied the insurance company its status as an excess insurer; (2) the unallocated settlement exceeded the amount of the concrete company's liability; and (3) the settlement was an attempt to "maximize a payout by [the insurance company]."

¶ 56 We note, initially, that the insurance company has not appealed the trial court's ruling that it was not an excess carrier. And, contrary to the insurance company's argument, we conclude that the other two assertions of prejudice were questions of fact that the jury was required to resolve. Based upon our review of the record, we further conclude that, after considering all the evidence in the light most favorable to the concrete company and indulging every reasonable inference drawn from the evidence favoring the concrete company's position, there was evidence of sufficient probative force to support the jury's findings. *See* *Hall*, 190 P.3d at 862.

¶ 57 In reaching this conclusion, we recognize that the settlement was not "allocated," meaning that it did not describe the damages that were covered by the insurance policy and those that were not, and that the trial court bifurcated the case into two trials.

¶ 58 Although the concrete company requested a larger damage award, the first jury found that the amount of damages it owed the general contractor, or the amount of damages that the concrete company could recover from the crane team, was $678,826. The second jury, after being instructed to make findings about how much of the $678,826 was covered by the insurance policy, found that $546,899 of the initial award represented such covered damages.

¶ 59 An insurer may demonstrate prejudice by showing that it "could have settled the underlying case for a small sum or smaller sum." *Friedland*, 105 P.3d at 648 n. 5. But here the concrete company introduced testimony that a portion of the settlement represented damages that were *not* covered by the insurance policy.

¶ 60 This proof included testimony from an expert who analyzed the settlement. The expert testified that part of the settlement was attributable to damages covered by the insurance policy and part was attributable to damages that were not covered by the insurance policy. Further, the chairman of the concrete company testified that the settlement was not allocated when it was negotiated because he thought that the various insurers would allocate it later.

¶ 61 In reaching this conclusion, we necessarily reject the insurance company's argument that all "unallocated" settlements are prejudicial as a matter of law. Where, as here, there is some evidence of how a settlement has been allocated, and the jury has been instructed to make such an allocation, a bright-line rule, such as the one the insurance company proposes, would undercut the function of the notice-prejudice rule. Although an insurer may prove prejudice by showing that its participation in the case would have created "a substantial likelihood of avoiding or minimizing the covered loss," *see id.* the notice-prejudice rule does not bar insureds from offering contrary evidence, *see id.* at 648.

¶ 62 Last, as indicated above, the record contains evidence that the concrete company's liability was "reasonably clear"; that the settlement was reasonable; and that the insurance company would not have achieved a result that was "materially better." The jury reasonably could have concluded that such evidence was sufficient to rebut the insurance company's contention that the settlement was an attempt to "maximize" the insurance company's "payout."

III. Sufficient Evidence Supported the Jury's Finding that the Insurance Company Unreasonably Delayed or Denied the Claim

A. Preliminary Issue Concerning the Duty to Indemnify

¶ 63 As a preliminary matter, the insurance company argues that the trial court erred when it determined that the in-

surance company's duty to indemnify the concrete company arose on the date that the insurance company received the general contractor's demand to pay its damages, which was March 21, 2008. The insurance company reasons that the language of the insurance policy did not create a duty to indemnify as of that date because (1) the general contractor had not sued the concrete company; (2) no judgment had been entered against the concrete company; and (3) the concrete company had not settled with the general contractor.

¶ 64 The trial court's order in question here was made *after* the verdict was rendered. In that order, the court decided that prejudgment interest should be calculated from March 21, 2008, the date that the concrete company first made a demand on the insurance policy. Thus, the court's order was *only* made in the context of determining the accrual date for purposes of calculating prejudgment interest, which the insurance company has not appealed.

¶ 65 We shall not address this issue because the order in which the court's determination was made has not been appealed, and because addressing this issue as now presented by the insurance company would remove it from its proper context. *See Pomeranz v. McDonald's Corp.,* 843 P.2d 1378, 1381 n. 5 (Colo.1993)("[P]etitioners have not appealed this determination ... and we do not address it."); *Donelson v. Fritz,* 70 P.3d 539, 546–47 (Colo.App.2002)(because the plaintiff did not object to an award of costs "on this basis" in the trial court, it may not raise the issue for the first time on appeal).

## B. Standard of Review

¶ 66 Even if it were to concede that it had a duty to pay benefits to the concrete company, the insurance company attacks the factual basis for the jury's finding that it unreasonably delayed or denied the concrete company's claim for coverage. As with the factual issue of prejudice, we must review the evidence on this issue in the light most favorable to the concrete company and "indulge every reasonable inference that can be drawn from the evidence in that party's favor." *See Hall,* 190 P.3d at 862.

## C. Discussion

¶ 67 The insurance company asserts that its communications with the concrete company clearly demonstrate that it did not deny the claim. We disagree, and we conclude that the jury's verdict was supported by sufficient evidence.

¶ 68 Sections 10–3–1115 and –1116 establish the standard of care for the handling of insurance claims. Section 10–3–1115(1)(a) states that "[a] person engaged in the business of insurance shall not unreasonably *delay* or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." (Emphasis added.) Section 10–3–1116(1) then provides that a "first-party claimant ... whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit."

¶ 69 The jury in the second trial found that the insurance company had unreasonably delayed or denied the concrete company's claim for benefits. Although the evidence at trial was contested, ample evidence supported this finding, including the following:

- Even though the insurance company's reservation-of-rights letters did not expressly state that it would not pay benefits, the insurance company took no other action to determine the amount of the concrete company's liability.

- The insurance company informed the general contractor that it would not pay on behalf of the concrete company because it believed that the concrete company was not liable.

- When it sought indemnity from the concrete company's subcontractors for related personal injury claims, including one that had not yet been filed, the insurance company refused to include the claim at issue here.

- The chairman of the concrete company testified that he "felt abandoned" by the insurance company's actions.

- The insurance company refused to adjust or to pay the claim upon receiving notice of the settlement.

● The concrete company's expert witness testified that a reasonable insurer would have determined the covered amount of the settlement and paid that amount within sixty days of learning about the settlement.

¶ 70 Viewing this evidence in the light most favorable to the concrete company, we conclude that it supports the jury's verdict. *See Hall*, 190 P.3d at 862.

## IV. The Insurance Company Waived Its Retroactivity Argument by Failing to Request a Limiting Instruction

¶ 71 The insurance company argues that the trial court should have granted a judgment notwithstanding the verdict because the court had erroneously allowed the jury to consider conduct that occurred before the effective date of sections 10–3–1115 and –1116, which was August 5, 2008. We conclude that the insurance company waived this argument because it did not request a limiting instruction.

¶ 72 C.R.C.P. 51 provides that "[a]ll instructions shall be submitted to the parties, who shall make all objections thereto before they are given to the jury." Failure to object to jury instructions before the jury retires to deliberate constitutes waiver. *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1200–01 (Colo.App.2009).

¶ 73 The insurance company first raised this argument in a motion for a judgment notwithstanding the verdict, after the jury had made its factual findings. In *Vaccaro*, the "jury was explicitly instructed to limit its consideration of the statutory claim to conduct occurring after August 5, 2008, and the verdict form for that claim repeated the limiting instruction." *Vaccaro*, ¶ 29. Here, the jury had no opportunity to determine whether the insurance company's act of denying indemnification to the concrete company occurred before or after the effective date of sections 10–3–1115 and –1116.

[I]f [an] instruction was unclear or unsuitable, it was incumbent upon [the party] to direct the trial court's attention to the faulty instruction in order to obtain a correction of it. This it did not do. A party may not consent to the submission of an instruction, and thereafter complain, upon

appeal, that the instruction failed to set forth applicable law.

*Kinard v. Coats Co.*, 37 Colo.App. 555, 558, 553 P.2d 835, 838 (1976).

¶ 74 Further, we conclude that this case does not present the exceptional circumstances that would justify the application of the plain error doctrine in a civil case. "[P]lain error review of instructional issues is restricted to unusual or special cases, and, even then, reversal occurs only when necessary to avert unequivocal and manifest justice." *Harris Grp.*, 209 P.3d at 1195.

## V. The Insurance Company Has Withdrawn Its Argument that Sections 10–3–1115 and –1116 Do Not Apply to Liability Policies

¶ 75 Interpreting the term "first-party claimant" in section 10–3–1116(1), the trial court determined that the statute covers liability policies. According to the insurance company, this decision conflicted with the view of a Colorado federal court decision. *See New Salida Ditch Co. v. United Fire & Cas. Ins. Co.*, 08–CV–0039 1—JLK, 2009 WL 5126498, at *5 (D.Colo. Dec. 18, 2009)(unpublished memorandum opinion and order) (holding that the statutes do not apply to liability policies), *aff'd*, 400 Fed.Appx. 338 (10th Cir.2010).

¶ 76 The insurance company raised this issue in its opening brief, and amici have filed briefs on both sides of the argument. In its reply brief, however, the insurance company withdrew this argument, stating that it was "not relevant to this appeal." Therefore, we will not address it, even though the amici have raised the issue. *See Gorman v. Tucker*, 961 P.2d 1126, 1131 (Colo.1998) ("We will not consider issues raised only by amicus curiae and not by the parties.").

## VI. Other Contentions

¶ 77 The insurance company raises several arguments for the first time in its reply brief. For example, it contends that the trial court erred when it rejected jury instructions that the insurance company had submitted. We will not address these issues. *See Vitetta v. Corrigan*, 240 P.3d 322, 330 (Colo.App.

2009)("[W]e do not consider appellate arguments raised for the first time in a reply brief.").

### The Concrete Company's Cross–Appeal

### VI.  The Trial Court Properly Reduced the Concrete Company's Damages

¶ 78 On cross-appeal, the concrete company, relying on the collateral source rule, argues that the trial court improperly reduced its damages by the amount that the insurer of one of the members of the crane team paid to satisfy the judgment in the first trial.  We disagree.

### A.  Standard of Review

¶ 79 The application of the collateral source rule is a question of law that we review de novo.  *S. Fork Water & Sanitation Dist. v. Town of S. Fork,* 252 P.3d 465, 468 (Colo.2011).  "We also review the interpretation of an insurance contract de novo." *Levy,* 293 P.3d at 43;  *see also Compass Ins. Co.,* 984 P.2d at 613.

### B.  The Collateral Source Rule in Colorado

¶ 80 The common law collateral source rule allows double recovery by a successful plaintiff, because "[a]ny third-party benefits or gifts obtained by the injured plaintiff accrue solely to the plaintiff's benefit and are not deducted from the amount of the tortfeasor's liability." *Volunteers of Am. v. Gardenswartz,* 242 P.3d 1080, 1083 (Colo. 2010);  *see also Wal–Mart Stores, Inc. v. Crossgrove,* 2012 CO 31, ¶¶ 9–11, 276 P.3d 562.  The rule is intended to prevent a tortfeasor from receiving a windfall, "in the form of reduced liability, from compensation in the form of money or services that the victim may receive from a third-party source." *Gardenswartz,* 242 P.3d at 1083.  The rule also prevents a jury from hearing evidence that a plaintiff received payment from a collateral source. *Crossgrove,* ¶ 18.

¶ 81 In 1986, the General Assembly abrogated this rule by enacting section 13–21–111.6, C.R.S.2012.  This statute

requires the trial court to reduce a successful plaintiff's verdict as a matter of law by the amount the plaintiff "has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company or fund in relation to the injury ... sustained."

*Crossgrove,* ¶ 14 (citing § 13–21–111.6).  The statute retains the common law rule, however, for "benefit[s] paid as a result of a contract entered into and paid for by or on behalf of [the plaintiff]." § 13–21–111.6.  It also retains the evidentiary bar mandated by the common law rule. *Crossgrove,* ¶ 18.

### C.  The "Other Insurance" Clause

¶ 82 Here, immediately before the second jury trial, the concrete company received a payment from the insurer of one of the members of the crane team.  This payment of $678,826 fully covered the first jury's award of damages against the member of the crane team.  As required by the contract between the concrete company and the member of the crane team, the concrete company was a named insured on the insurance policy of the member of the crane team.  The second jury, which considered only the insurance company's liability to the concrete company, awarded the concrete company $546,899, based on its finding that this figure was covered by the insurance company's policy.

¶ 83 After trial, the trial court determined that the payment that the concrete company received from the insurer of the member of the crane team represented a benefit from a "contract entered into by *or on behalf of*" the concrete company.  Therefore, the common law collateral source rule would normally apply and setoff would not be required.  But the trial court also determined that the concrete company contracted away its right to a double recovery through the "other insurance" clause present in its insurance policies with the insurance company and the insurer of the member of the crane team.

¶ 84 The "other insurance" clause present in both policies provided that:

[I]f other valid and collectible insurance is available to the insured for a loss we cover ... our obligations are limited as follows:

...

If all other insurance permits contribution by equal shares, we will follow this method also.  Under this approach, each insurer

contributes equal amounts until it has paid its applicable limit of insurance of [sic] none of the loss remains, whichever comes first.

¶ 85 The unambiguous language of these clauses states that the concrete company contracted away its right to recover benefits from *both* the insurance company and the insurer of the member of the crane team. After the insurer of the member of the crane team paid the concrete company $678,826, which was the portion of the settlement with the general contractor that, according to the first jury, represented the concrete company's damages resulting from the accident, "none of [that] loss remained" for the insurance company to pay.

¶ 86 We reject the concrete company's argument that the trial court's setoff defeated the punitive purpose of section 10–3–1116. The insurance company correctly notes that it would not have owed anything to the concrete company without the penalty because the first jury held that the crane team was at fault. The member of the crane team, or its insurer, was obligated to pay benefits to the concrete company to compensate the concrete company for its damages. Therefore, based on our de novo review and our interpretation of the two insurance policies, we conclude that the trial court did not err when it reduced the damages by the amount that the insurer for the member of the crane team paid to the concrete company to satisfy the judgment in the first trial.

### D. Waived Argument

¶ 87 We do not address the concrete company's assertion that it was entitled to a total of *three* times the covered benefit under sections 10–3–1115 and –1116. The concrete company raised this argument for the first time in its cross-reply brief, and it is therefore waived. *See Vitetta,* 240 P.3d at 330.

### VII. Repair and Replacement Costs

¶ 88 The trial court granted the insurance company's motion for summary judgment on the issue whether the insurance contract provided coverage for the concrete company's repair and replacement costs of its concrete components that were damaged in the accident. The concrete company alleges that this was error. We disagree.

### A. The Court's Ruling

¶ 89 As pertinent here, the trial court's order granting summary judgment on this issue states that the court

agree[s] with [the insurance company] that [the insurance policy] unambiguously excludes coverage for the damages [the concrete company] suffered to its own property, which [the concrete company] characterizes ... as "replacement of damaged work," and for which it seeks $261,447.48. These damages consist of the costs [the concrete company] incurred in demolishing and removing the damaged [concrete material], delivering and erecting ... new [concrete material], erecting new safety rails, and management, engineering and legal costs associated with responding to the accident. [The insurance policy] is a *liability* policy, not a builder's risk policy, and it therefore expressly excludes from its coverage damages caused to [the concrete company's] own property.

¶ 90 In a motion for reconsideration, the concrete company argued that, because the parts were already installed on the base, they belonged to the government and therefore fell outside this exclusion. On the first day of trial, the trial court denied this motion for reconsideration, stating that the claimed damages were excluded "as a result, I believe, of an unambiguous application of Exclusion J."

### B. Standard of Review

¶ 91 Under the common law, "the insurer bears the burden of proving that a particular loss falls within an exclusion in the contract." *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.,* 207 P.3d 839, 842 (Colo.App.2008). "If a limitation or exclusion in a contract is unambiguous, that limitation or exclusion must be enforced." *Id.* The trial court's interpretation of an insurance policy is also a question of law that we review de novo. *Id.* at 841.

¶ 92 Summary judgment "should only be granted if there is a clear showing that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law." *Compass Ins. Co.,* 984 P.2d at 613. "The nonmoving party is enti-

tled to all favorable inferences that may be drawn from the undisputed facts, and all doubts as to whether a triable issue of fact exists must be resolved against the moving party." *Id.* We review an order granting summary judgment de novo. *Shelter Mut. Ins. Co. v. Mid–Century Ins. Co.*, 246 P.3d 651, 657 (Colo.2001).

### C. The Language of the Exclusions in the Insurance Policy

¶ 93 The exclusions to which the court's order refers appear in Section I2(j) of the insurance policy. There are three that pertain to our analysis here, which specifically exclude from coverage property damage to:

> [(j)(1)] Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
>
> . . .
>
> [(j)(5)] That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> [(j)(6)] That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

¶ 94 The insurance policy defines several terms used in these exclusions.

¶ 95 Subsection V17 defines "property damage" to mean:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

¶ 96 Subsection V13 defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 97 Subsection V22, as pertinent here, defines "your work" to mean "(1) [w]ork or operations performed by you or on your behalf; and (2) [m]aterials, parts or equipment furnished in connection with such work or operations."

¶ 98 There are two other phrases included in the two exclusions pertinent to our analysis that are not defined by the insurance policy. However, these phrases are commonly used, and they have been interpreted by courts in other cases.

¶ 99 The phrase "are performing operations," found in exclusion I2(j)(5), has been construed to mean "the active performance of work." *See Mid–Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009); *see also Advantage Homebuilding, L.L.C. v. Maryland Cas. Co.*, 470 F.3d 1003, 1010 (10th Cir.2006) (An exclusion substantially similar to the one here "applies whenever *property damage* 'arise[s] out of the work of the insured, its contractors, or its subcontractors while "performing operations." '" (quoting F. Malcolm Cunningham & Amy L. Fischer, *Insurance Coverage in Construction – The Unanswered Question*, 33 Tort & Ins. L.J. 1063, 1093 (Summer 1998))). Thus, the exclusion in I2(j)(5) "applies only to damage caused during active physical construction activities" and does not apply to "damage caused during a prolonged suspension of active construction work." *JHP Dev., Inc.*, 557 F.3d at 213.

¶ 100 The phrase "that particular part," found in subsection I2(j)(5) has been construed to "den[y] coverage for property damage to the particular part of the real property that is the subject of the insured's work at the time of the damage, if the damage arises out of those operations." *Columbia Mut. Ins. Co. v. Schauf*, 967 S.W.2d 74, 81 (Mo. 1998).

¶ 101 The phrase "that particular part," found in subsections I2(j)(6), has been construed to

> bar coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work

by the insured and were damaged as a result of defective work by the insured on other parts of the property.

*JHP Dev., Inc.*, 557 F.3d at 215.

¶ 102 A federal district court concluded that an exclusion that was substantially the same as exclusion I2(j)(5) was not ambiguous. *See Malone v. Scottsdale Ins. Co.*, 147 F.Supp.2d 623, 629 (S.D.Tex.2001); *but see Fisher v. Am. Family Mut. Ins. Co.*, 579 N.W.2d 599, 604 (N.D.1998) (exclusion that was substantially similar to exclusion I2(j)(5) was ambiguous, so it would be strictly construed in favor of the insured to exclude coverage "only for property damage during the time [the insured] worked upon the property"). A division of this court held that an exclusion that was worded substantially the same as exclusion I2(j)(6) was not ambiguous. *See McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 525 (Colo.App.2004).

### D. Application of the Exclusions to this Case

¶ 103 We agree with the trial court's observation that the insurance policy in this case, which is a commercial general liability policy, "is a *liability* policy, not a builder's risk policy." As a result, we conclude that it

> expressly exclude[s] coverage for the insured's faulty workmanship.... The primary purpose of this exclusion to [sic] prevent liability policies from insuring against an insured's own faulty workmanship, which is a normal risk associated with operating a business....
> The inclusion of [such an] exclusion in a commercial general liability policy discourages the performance of careless work by requiring an insured to pay for losses caused by the insured's own defective work. Further, [it] ... prevent[s] liability insurance from becoming a performance bond.

9A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 129:17 (3d ed.2012) (footnotes omitted); *see also Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142 (10th Cir.2005) ("Damage to an insured's own work resulting from his faulty workmanship on it is usually covered by a performance bond, not a commercial general liability policy."); *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 802 (Colo.2007) ("[Commercial general liability] policies often contain an exclusion for damage to property owned by the insured in order to prevent the [commercial general liability] policy from serving as a property insurance policy."); *McGowan*, 100 P.3d at 525 ("General liability insurance policies ... are not intended to be the equivalent of performance bonds.").

#### 1. Affirming on Different Grounds

¶ 104 The concrete company argues that we should not consider exclusion I2(j)(1) because the insurance company did not refer to this exclusion in its summary judgment motion or in its response to the motion to reconsider. Rather, the insurance company relied on exclusions I2(j)(5) and (6). The concrete company points out that the insurance company bore the burden of proving that the loss fell within exclusion I2(j)(1). *See Colo. Intergovernmental Risk Sharing Agency*, 207 P.3d at 842.

¶ 105 The insurance company responds that we may affirm a trial court's ruling based on any grounds that the record supports. *See Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo.App.2004); *see also Bruce v. City of Colo. Springs*, 131 P.3d 1187, 1191 (Colo.App.2005)(affirming summary judgment order on different grounds).

¶ 106 We agree with the insurance company because (1) a decision to grant summary judgment is an issue of law that we review de novo, *see Shelter Mut. Ins. Co.*, 246 P.3d at 657; *Compass Ins. Co.*, 984 P.2d at 618; and (2) the trial court's order referred only generically to the exclusions in I2(j), and it did not specifically rely upon, or exclude, any of them.

#### 2. Exclusions I(2)(j)(1), (5), and (6)

¶ 107 The concrete company's request for replacement costs is based upon a report, prepared by its expert. This report stated that "[t]hese costs were expended for the required corrective work resulting from the accident [and] the added safety and erection requirements imposed" by the Army base and the general contractor. As the trial court recognized in its summary judgment

order, these costs were allocated among several categories:

the costs [the concrete company] incurred in demolishing and removing the damaged [concrete material], delivering and erecting ... new [concrete material], erecting new safety rails, and management, engineering and legal costs associated with responding to the accident.

¶ 108 After reviewing the record, and in the course of our de novo review, we conclude that the insurance company has established that (1) these losses fell within exclusions I(2)(j)(1), (5), and (6), see Colo. Intergovernmental Risk Sharing Agency, 207 P.3d at 842; (2) these exclusions are unambiguous, see id.; (3) the exclusions must be enforced, see id.; (4) the trial court's decision to grant summary judgment on this issue was based on a clear showing that there was no genuine issue of material fact as to these exclusions, see Compass Ins. Co., 984 P.2d at 618; and (5) the insurance company was entitled to judgment as a matter of law on this issue, see id. We rely on the following reasons to support these conclusions.

¶ 109 First, after examining the plain language of exclusion I2(j)(1), we conclude that it is not ambiguous. Further, we are persuaded by the reasoning in Malone, 147 F.Supp.2d at 629, and Fisher, 579 N.W.2d at 604, that exclusion I2(j)(5) is not ambiguous as long as we construe it in favor of the insured to exclude coverage only for "damage caused during active physical construction activities," but not for "damage caused during a prolonged suspension of active construction work." JHP Dev., Inc., 557 F.3d at 213. Moreover, we are persuaded by the reasoning in McGowan, 100 P.3d at 525, that exclusion I2(j)(6) is not ambiguous.

¶ 110 Second, the record supports the conclusion that the concrete company's request for replacement costs was based on "damage caused during active physical construction activities."

¶ 111 Third, the accident was a product of "faulty workmanship" because it was caused by a crane hook catching a safety stanchion and pulling one of the concrete components off of its support beams.

¶ 112 Fourth, the damaged concrete, which the concrete company replaced, belonged to the concrete company. The construction contract to which the concrete company was a signatory stated that title to the work did not transfer to the Army base until it was complete and the base had accepted it.

¶ 113 Fifth, the exclusions apply to property damage caused by the crane team because the crane team consisted of subcontractors working directly or indirectly on the concrete company's behalf.

¶ 114 Sixth, the various costs that do not directly involve damaged property included in the company's request for reimbursement fall within the ambit of exclusion I2(j)(1) that excludes from coverage "any costs or expenses incurred by you ... for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property."

¶ 115 Seventh, for the purposes of exclusions I2(j)(5) and (6), the property damage was to "that particular part" of the construction project on which the concrete company and the crane team were working—the wall panels and the roof beams. Thus, for the purposes of exclusion I2(j)(5), the damage was to "the particular part of the real property that is the subject of the insured's work at the time of the damage," Columbia Mut. Ins. Co., 967 S.W.2d at 81, and, for the purposes of exclusion I2(j)(6), the property damage was to "parts of a property that were themselves the subject of defective work" by the concrete company and the crane team, JHP Dev., Inc., 557 F.3d at 215; see also Am. Equity Ins. Co. v. Van Ginhoven, 788 So.2d 388, 391 (Fla.Dist.Ct.App. 2001)(when insured was hired to repair a swimming pool, and draining the pool caused it to rise out of the ground, the "particular part" of the project excluded from coverage was the entire pool under exclusions that were substantially similar to exclusions I2(j)(5) and (6)); Sapp v. State Farm Fire & Cas. Co., 226 Ga.App. 200, 486 S.E.2d 71, 74 (1997) (exclusions, including ones that were substantially similar to those here, were "designed to exclude coverage for defective

workmanship by the insured builder causing damage to the construction project itself").

## VIII. The Trial Court Abused Its Discretion When It Determined That "Fees–on–Fees" Were Not Recoverable

¶ 116 The concrete company argues that the trial court incorrectly deducted the fees and costs that it incurred in bringing the fee request, namely, the "fees-on-fees," from its award under section 10–3–1116(1). We agree, so we conclude that the concrete company is entitled to an award of reasonable "fees-on-fees," and we remand the case to the trial court so that it can determine and award such "fees-on-fees."

### A. Standard of Review

¶ 117 We normally review the trial court's decision to award attorney fees for an abuse of discretion. But "we review the legal conclusions which provided the basis for that decision de novo." *Jorgensen v. Colo. Rural Props., LLC,* 226 P.3d 1255, 1259 (Colo.App. 2010); *see also Sch. Dist. No. 12 v. Sec. Life of Denver Ins. Co.,* 185 P.3d 781, 787 (Colo. 2008); *US Fax Law Ctr., Inc. v. Henry Schein, Inc.,* 205 P.3d 512, 515 (Colo.App. 2009).

### B. Discussion

██ ¶ 118 Section 10–3–1116(1) provides that an insured "whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." The plain language of the statute neither permits nor disallows "fees-on-fees."

¶ 119 A division of this court has concluded that attorney fees awarded under section 10–3–1116(1) are "damages for this statutory claim." *Hall v. Am. Standard Ins. Co.,* 2012 COA 201, ¶¶ 20–22, 292 P.3d 1196. The division reasoned that

[c]lassification of attorney fees as either costs or damages depends on context, and turns on the nature of the requested attorney fees in a particular case. Attorney fees are clearly damages when they are part of the substance of a lawsuit, that is, when the fees sought are the "legitimate consequences" of the tort or breach of

contract sued upon, "such as in an insurance bad faith case."

*Id.* at ¶ 15 (quoting *Ferrell v. Glenwood Brokers, Ltd.,* 848 P.2d 936, 941 (Colo.1993)); *see also* § 10–3–1116(4), C.R.S.2012 ("Damages awarded pursuant to this section shall not be recoverable in any other action or claim." (Emphasis added.)).

¶ 120 We are persuaded by the division's reasoning in *Hall v. American Standard Insurance Co.,* so we shall apply it here. As a result, we conclude that a request for "fees-on-fees" in connection with a section 10–3–1116(1) claim would be, like requests for "reasonable attorney fees and court costs and two times the covered benefit," 2012 COA 201, ¶ 18, 292 P.3d 1196, a request for damages.

¶ 121 We also conclude that, because this request for damages is part of a remedial statutory scheme, the trial court erred when it (1) ruled that the concrete company was not entitled to its "fees-on-fees" associated with the fee hearing; and (2) reduced the concrete company's attorney fee and cost award by $132,928 for that reason.

¶ 122 If a fee-shifting provision in a statute is part of a larger remedial scheme, appellate courts in Colorado have upheld awards of "fees-on-fees" based on the compensatory purpose of fee-shifting. Addressing an action by tenants for wrongful withholding of their security deposit, the supreme court ordered an attorney fee determination, stating that "[a]ttorneys' fees allowable include those incurred in resolving the fee issue, *Gurule v. Wilson* [635 F.2d 782 (10th Cir.1980), *abrogated by Cox v. Flood,* 683 F.2d 330 (10th Cir.1982) ], and those incurred on appeal." *Mau v. E.P.H. Corp.,* 638 P.2d 777, 781 (Colo.1981). Citing *Mau,* a division of our court held that the Security Deposit Act "entitle[s] successful tenants to recover attorney fees for landlords' independent actions challenging rulings and fee awards in the underlying security deposit litigation." *Mishkin v. Young,* 198 P.3d 1269, 1274 (Colo. App.2008).

¶ 123 The division in *Mishkin* relied upon the remedial purposes of the statute to justify its holding. *Id.* ("If requiring a tenant to defend an appeal without attorney fees would

undercut the [Act's] objectives, by substantially deplet[ing] the initial award, so too would requiring a tenant to take up the gauntlet of an independent action without fees.") (quotations omitted).

¶ 124 Like the Security Deposit Act, section 10–3–1116 was enacted as a remedial measure, intended "to curb perceived abuses in the insurance industry." *Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 976 (Colo.App.2011). Therefore, we conclude that the reasoning in *Mishkin* and *Mau* applies to this statute. Without its "fees-on-fees," a successful insured's award of two times the covered benefit and attorney fees and costs would be "substantially deplet[ed]" by the costs of the fee proceeding. *Mishkin*, 198 P.3d at 1274. This conclusion is also consistent with authority that provides for an award of attorney fees on appeal when a statute or contract explicitly provides for fee-shifting. *See Melssen v. Auto–Owners Ins. Co.*, 2012 COA 102, ¶ 75, 285 P.3d 328 (under section 10–3–1116, awarding attorney fees on appeal).

¶ 125 In reaching this conclusion, we necessarily reject the insurance company's comparison of section 10–3–1116 and section 13–17–102, C.R.S.2012. Section 13–17–102 permits trial courts to sanction attorneys and parties for actions or defenses which lack substantial justification because they are "substantially frivolous, substantially groundless, or substantially vexatious." *Anderson v. Pursell*, 244 P.3d 1188, 1196 (Colo.2010). And an award of costs and attorney fees is only appropriate under section 13–17–102 "if the trial court finds that the defense to the motion lacked substantial justification." *Anderson*, 244 P.3d at 1198; *accord Parker v. Davis*, 888 P.2d 324, 327 (Colo.App.1994).

¶ 126 But the supreme court in *Anderson* expressly limited its holding to fee actions brought under section 13–17–102. *Anderson*, 244 P.3d at 1198 ("The cases that they cite for this proposition, however, do not deal with the specific situation that we are faced with here under section 13–17–102."). This express limitation makes clear that our holding does not conflict with the supreme court's decision in *Anderson*.

¶ 127 Further, we respectfully disagree with the trial court's observation that its decision to deny the concrete company's request for "fees-on-fees" was

> bolstered by the fact that a successful bad faith plaintiff is also entitled to double damages. He will not ordinarily be forced to see the insurance benefits to which he was contractually entitled consumed by fees-on-fees because he will recover twice the amount of those insurance benefits. In this case, for example, [the concrete company] has already been paid the underlying insurance benefit of $546,899, but will also be getting a judgment for another $546,899 as a statutory penalty[.] That penalty, even in a case like this, will be more than enough to compensate [the concrete company] for its fees-on-fees.

¶ 128 This reasoning is inconsistent with the language of section 10–3–1116(1), which states that an insured may bring an action to recover "attorney fees *and* court costs *and* two times the covered benefit." (Emphasis added.) When the court considered the amount of the "covered benefit" as a reason to deny the concrete company's "fees-on-fees," it effectively turned the statutory "and" into "or."

¶ 129 We therefore reverse this portion of the court's judgment, and we remand to the trial court to determine and to award the concrete company its reasonable "fees-on-fees."

## IX. The Trial Court Did Not Abuse Its Discretion When It Reduced the Fee Award for Duplicative Effort

¶ 130 The concrete company contends that the trial court's twenty percent reduction in its fee award was unsupported by the record because (1) the concrete company did not delay the case by failing to clarify that its claims were based in tort; (2) the twenty percent reduction was imprecise and arbitrary; and (3) the reduction should apply only to the member of the crane team, not to the concrete company. We reject these contentions.

## A. Standard of Review

¶ 131 We review the decision to award attorney fees for an abuse of discretion, and we "will only disturb the award if it is manifestly arbitrary, unreasonable, or unfair." *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo.2004); *see also Payan v. Nash Finch Co.*, 2012 COA 135, ¶ 16, 310 P.3d 212. "The determination of reasonableness of attorney fees is a question of fact for the trial court, and its ruling will not be disturbed on review unless patently erroneous and unsupported by the record." *Payan*, ¶ 16.

## B. Discussion

¶ 132 First, the trial court adequately explained its reasons for the twenty percent reduction in attorney fees. The concrete company did not clarify whether its claims against the member of the crane team would be based on tort or contract principles until it filed a motion in limine three weeks before the first trial. By this time, the concrete company and the member of the crane team had prepared expert witnesses to testify about causation and the standard of care, most of which became unnecessary once the concrete company clarified the nature of its claims. The trial court determined that the motion in limine could have been filed much earlier, and that the concrete company's delay wasted its own time, effort, and attorney fees. Because these factual findings are supported by the record, we will not disturb them. *See Payan*, ¶ 16; *Tallitsch v. Child Support Servs., Inc.*, 926 P.2d 143, 147 (Colo. App.1996).

¶ 133 Second, the twenty percent amount is supported by the record. In its order, the trial court stated that twenty percent of the attorney fees that it otherwise would have awarded to the concrete company "were wasted fees and costs because of this delay in raising this tort/contract issue, and [it would] reduce the award accordingly." The trial court reached the twenty percent figure by analyzing the billing records of the attorneys who represented the concrete company, incorporating expert testimony that generally described the billing practices of those attorneys, and relying on its own observations. Therefore, we conclude that the trial court's decision was not "patently erroneous." *Tallitsch*, 926 P.2d at 147.

¶ 134 Third, the trial court made the twenty percent reduction *before* it allocated the award between the member of the crane team and the insurance company. In its order, it stated:

First, I will subtract from the final request a total of $132,928 to reflect the fees-on-fees I am not awarding.... Next, I will deduct an amount for work that in my judgment did not reasonably advance [the concrete company's] claims against either [the member of the crane team or the insurance company] because it was aimed primarily by or at the other [d]efendants. I will then reduce the balance by twenty percent to reflect fees that were unnecessarily increased by [the concrete company's] failure to resolve the tort/contract issues in a timely fashion.... Then I will allocate the balance in two steps....

¶ 135 We recognize that the delay caused by the concrete company's belated motion in limine affected only the first trial, and that these fees represented the concrete company's effort only against the member of the crane team. But by determining the amount of this wasted time before it allocated the fees, the trial court ensured that neither the member of the crane team nor the insurance company would pay for this amount. And the reduction did not apply to the amount that the trial court later determined that the insurance company should pay. Therefore, we conclude that the trial court's attorney fee award was not manifestly arbitrary, unreasonable, or unfair, *see Archer*, 90 P.3d at 230, and that its determination of the reasonableness of the attorney fees that the concrete company had requested is supported by the record and is not patently erroneous, *see Payan*, ¶ 16.

## X. Attorney Fees and Costs on Appeal

¶ 136 Because it prevailed on its claim under section 10–3–1116, the concrete company requests an award of attorney fees and costs that it has incurred in bringing this appeal. "When a party is awarded attorney fees for a prior stage of the proceedings, it may recover reasonable attorney fees and costs for successfully defending the appeal." *Melssen*, ¶ 75 (quoting *Kennedy v. King*

*Soopers, Inc.*, 148 P.3d 385, 390 (Colo.App. 2006)). Accordingly, we remand this case to the trial court for a determination of the reasonable amount of attorney fees and costs that the concrete company incurred in defending the judgment on the statutory claim on appeal. *See* C.A.R. 39.5.

## XI. Conclusion

¶ 137 We reverse the portion of the judgment in which the trial court ruled that the concrete company was not entitled to its "fees-on-fees," and we remand to the trial court to determine and award reasonable "fees-on-fees" to the concrete company. The judgment is affirmed in all other respects. The case is also remanded to the trial court to conduct the proceedings necessary to award reasonable appellate attorney fees and costs to the concrete company.

JUDGE RICHMAN concurs.

JUDGE J. JONES specially concurs.

JUDGE J. JONES specially concurring.

¶ 138 I concur in the majority's judgment in full. On the question of the concrete company's entitlement to an award of so-called "fees-on-fees," however, my reasons for concluding that the concrete company is entitled to such an award differ from those given by the majority. I conclude that the relevant statutory provision, subsection 10–3–1116(1), C.R.S. 2012, provides for an award of attorney fees as "costs," not "damages." Under our case law applying other fee-shifting provisions, it follows that the concrete company is entitled to an award of fees-on-fees.

¶ 139 Colorado follows the "American rule" regarding awards of attorney fees: parties in litigation generally pay their own attorney fees. *Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1287 (Colo.1996); *see Ferrell v. Glenwood Brokers, Ltd.*, 848 P.2d 936, 940 (Colo.1993). But statutes, court rules, the common law, and contracts sometimes provide for an award of attorney fees to a party in particular circumstances. *Bernhard*, 915 P.2d at 1287 & n. 3 (identifying exceptions to the general rule).

¶ 140 Attorney fees that may be awardable fall into either of two categories: those that are awardable as "damages" and those that are awardable as "costs." *See Ferrell*, 848 P.2d at 940–41. Those fees awardable as "damages" are those incurred by the claimant as a legitimate consequence of the tort or breach of contract sued upon. *Id.* at 941 (citing *Bunnett v. Smallwood*, 793 P.2d 157, 160 (Colo.1990)); *Elijah v. Fender*, 674 P.2d 946, 951–52 (Colo.1984); *Publix Cab Co. v. Colo. Nat'l Bank of Denver*, 139 Colo. 205, 230, 338 P.2d 702, 715 (1959); *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 150 (Colo.App.2003); *see Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1115–16 (10th Cir.2009); *Bunnett*, 793 P.2d at 160 (such fees "are the subject of the lawsuit itself rather than an award to the successful litigant"); *see also* 1 Robert L. Rossi, *Attorneys' Fees* § 8.3, at 8–6 to 8–7 (3d ed.2011) ("[W]here the wrongful act of the defendant has involved the plaintiff in litigation with others, or placed the plaintiff in such relation with others as makes it necessary to incur expense to protect his or her interest, such expenses, including attorneys' fees, should be treated as the legal consequence of the original wrongful act, and may be recovered as damages."); Restatement (Second) of Torts § 914(2) (1979). For example, the fees incurred by the claimant in litigation against a third party, where such litigation was a proximate consequence of the defendant's wrongdoing, are damages. *Bernhard*, 915 P.2d at 1287 n. 3, 1288; *Publix Cab Co.*, 139 Colo. at 230, 338 P.2d at 715; *see also Simplot*, 563 F.3d at 1115–16; *N. Am. Specialty Ins. Co. v. Corr. Med. Servs., Inc.*, 527 F.3d 1033, 1039 (10th Cir.2008) (fees insured incurred in defending other litigation were recoverable as damages in suit against insurer which had allegedly breached its duties to defend and pay benefits).

¶ 141 But, important here, although "the fees incurred in the third party suit may be recovered in a later action against the wrongdoer, ... the fees incurred in bringing the actual action against the wrongdoer are not recoverable." *Bernhard*, 915 P.2d at 1287 n. 3; *see also id.* at 1291 (fees incurred in bringing an insurance bad faith action are not recoverable as damages); *Bunnett*, 793 P.2d at 160 ("[A]ttorney fees ... are not considered actual damages."); *Publix Cab Co.*, 139 Colo. at 230, 338 P.2d at 715; Rossi,

§ 8.1, at 8–3, § 8.3, at 8–12, § 8.4, at 8–13 to 8–14. More precisely, the fees incurred in bringing the actual action against the wrongdoer are not "damages" and hence are not recoverable as such.

¶ 142 The fees incurred in the actual action against the wrongdoer are recoverable, if at all, as "costs." *See Ferrell,* 848 P.2d at 941–42. Such costs are awardable if there is a fee-shifting provision in law or contract providing for an award of attorney fees to a prevailing party. *Id.*; *see Simplot,* 563 F.3d at 1115–16; *Bunnett,* 793 P.2d at 160–61.

¶ 143 In sum, there is a substantive difference between fees awardable as damages and those awardable as costs. The fees incurred as a result of the wrongdoing may be recoverable as damages, but are not costs. Conversely, the fees incurred in the action against the wrongdoer may be recoverable as costs, but are not damages.[1]

¶ 144 Whether particular fees are awardable as damages or as costs has other important consequences. For example, if attorney fees are sought as damages (and properly fit within that category), they "must be determined by the trier of fact and proven during the damages phase." *Ferrell,* 848 P.2d at 941; *see Simplot,* 563 F.3d at 1115–17 (a party has a Seventh Amendment right to a jury trial on the amount of attorney fees claimed as damages).[2]

¶ 145 So, does subsection 10–3–1116(1) provide for an award of attorney fees incurred as damages, or for an award of attorney fees incurred as costs? It states that an insured "whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." Though it seems to me clear that the "covered benefit" is damages, the plain language of the subsection's terms, even considered as a whole and in light of the entire statutory scheme, *see Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 570 (Colo.2008), does not clearly indicate that the fees awardable thereunder are damages. Nor does the plain language clearly indicate that the awardable attorney fees are costs. Therefore, the statute is ambiguous on that point.

¶ 146 Where, as here, a statute is ambiguous, the court may consider extrinsic indicators of legislative intent. *Lombard,* 187 P.3d at 570; *State v. Nieto,* 993 P.2d 493, 500–01 (Colo.2000); *see* § 2–4–203, C.R.S.2012.

¶ 147 I have reviewed the legislative history of House Bill 08–1047, of which section 10–3–1116 was a part. *See Nieto,* 993 P.2d at 501 (court may consider legislative history if a statute is ambiguous); *see also* § 2–4–203(1)(c) (same). It sheds no direct light on this point.

¶ 148 Considering the object sought to be attained, however, is somewhat helpful. *See Colo. Dep't of Labor & Emp't v. Esser,* 30 P.3d 189, 195 (Colo.2001) (court may consider object to be attained if statute is ambiguous); *see also* § 2–4–203(1)(a) (same). House Bill 08–1047 was enacted to further deter insurers from unreasonably delaying or denying the payment of benefits. Its title is: "Concerning strengthening penalties for the unreasonable conduct of an insurance carrier, and making an appropriation in connection therewith." Certainly, that object could be furthered by allowing an award of attorney fees incurred as damages or an award of attorney fees incurred as costs. But, as alluded to above, under the common law, fees

1. In *Ferrell,* the court observed that " 'attorney fees are neither costs nor damages, but a hybrid, partaking of each in varying degrees.' " *Ferrell,* 848 P.2d at 941 (quoting 1 Mary Frances Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees* ¶ 1.02, at 1–9 (1992)). Considered in context, the court was not saying that particular fees incurred can be both costs and damages, or are neither, but rather that it is inaccurate to characterize all attorney fees as either one or the other.

2. In *Hall v. American Standard Insurance Co. of Wisconsin,* 2012 COA 201, ¶ 16, 292 P.3d 1196, the division held that attorney fees recoverable under subsection 10–3–1116(1) are "damages," and may be awarded by the court after trial. I respectfully disagree with that decision. The fees sought in that case were those incurred in the action against the insurer under sections 10–3–1115 and –1116, not fees incurred as a result of the insurer's breach. Thus, the fees sought were not damages. And even if they were damages, *Ferrell* says that the fact finder must determine those fees just as with any other category of damages. As discussed below, I believe subsection 10–3–1116(1) provides for an award of fees as costs.

incurred as a result of an insurer's bad faith breach of the insurance contract are already awardable as damages; the fees incurred in the action against the insurer are not. *Bernhard,* 915 P.2d at 1291. A common law bad faith claim will often (indeed, perhaps almost always) accompany a claim under sections 10–3–1115 and –1116. Thus, providing for an award of the same fees already recoverable under the common law would render subsection 10–3–1116(1) less effective in attaining its object—it would not, at least in many cases, "strengthen[ ] penalties" against insurers who act unreasonably. It seems to me, therefore, more likely that the General Assembly instead intended subsection 10–3–1116(1) to fill a gap—to provide a remedy that was previously unavailable. *See Buckley v. Chilcutt,* 968 P.2d 112, 117 (Colo.1998) (if statute is ambiguous, court may consider potential consequences of a particular construction); *see also* § 2–4–203(1)(e) (same).

¶ 149 Considering a similar law is also somewhat helpful. *See Am. Numismatic Ass'n v. Cipoletti,* 254 P.3d 1169, 1172 (Colo. App.2011) (if statute is ambiguous, court may consider laws on similar subjects); *see also* § 2–4–203(1)(d) (same). In *Mishkin v. Young,* 198 P.3d 1269 (Colo.App.2008), the division considered a statute allowing a tenant to sue a landlord for willful retention of a security deposit. That statute provides that such willful retention "shall render a landlord liable for treble the amount of that portion of the security deposit wrongfully withheld from the tenant, together with reasonable attorneys' fees and court costs...." § 38–12–103(3)(a), C.R.S.2012. The division regarded this statute as requiring an award of fees incurred in the action against the landlord (i.e., as costs), including attorney fees incurred on appeal. *Mishkin,* 198 P.3d at 1273–74.

¶ 150 In the end, therefore, I conclude that subsection 10–3–1116(1) provides for an award of attorney fees (and costs) incurred in the statutory action against the insurer—that is, those fees incurred as costs. It follows that the concrete company is entitled to an award of fees-on-fees. *See Mau v. E.P.H.*

*Corp.,* 638 P.2d 777, 781 (Colo.1981); *see also Mishkin,* 198 P.3d at 1274.